**In the Interest of I.L.G.R., C.L.G.R. and E.V.G.R., Children, K.R., Father, Appellant,**

**State of Iowa, Appellee.**

**No. 87–1209.**

Supreme Court of Iowa.

Dec. 21, 1988.
Rehearing Denied Feb. 20, 1989.

**682**

William F. Denman, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Valencia Voyd McCown, Asst. Atty. Gen., for appellee.

Mary K. Wickman, Des Moines, guardian ad litem and attorney for the children.

Considered by McGIVERIN, C.J., and LARSON, SCHULTZ, LAVORATO and SNELL, JJ.

McGIVERIN, Chief Justice.

The father of three children appeals from the juvenile court order terminating his parental rights with the children. On appeal, the father contends that clear and convincing evidence did not exist to support termination of his parental rights. The case was transferred to the court of appeals, which reversed. We then granted the State's application for further review. We now vacate the decision of the court of appeals and affirm the judgment of the juvenile court.

I. *Background facts and proceedings.* This case concerns the termination of pa-

rental rights of a father, Kelvin, and his three children; his son Isaac, and twin daughters Elnora and Chantelle.[1] The parental rights of the children's mother, Rebecca, were also terminated in the district court. That decision is the subject of a separate appeal that is not presently before us.

Due to the seriousness of this case, it is necessary to relate the evidence from the record in some detail.

Kelvin was born in 1957. Although Kelvin initially reported that he had a normal and happy childhood, he later admitted that as a child he was the victim of sexual and physical abuse. Kelvin has completed some college course work. He has been employed as a counselor in a number of settings and has worked for a television station. At the time of the termination hearing, Kelvin was employed as a counselor in a group home for retarded persons.

Rebecca was born in 1963. One of three children and the only girl, Rebecca was reportedly sexually abused as a teenager by an older brother. Rebecca has a history of mental illness beginning in her teenage years that has necessitated hospitalizations and shelter care.

Kelvin and Rebecca met when she was in shelter care in Indianola. Kelvin was a counselor at the facility on a volunteer basis. Rebecca left there for a residential treatment facility in Des Moines. While there, Rebecca became pregnant with her son, Isaac. Kelvin, who at the time was married and had one child, was the father of Rebecca's baby. Rebecca was transferred to Hillcrest Group Home in Dubuque to await the birth of her baby.

Rebecca gave birth to Isaac on December 10, 1981. Rebecca intended to place the baby in an adoptive home and took the initial steps to effectuate that plan. Upon petition by the State on the grounds of abandonment, Isaac was adjudicated a Child In Need of Assistance (CHINA)[2] on

1. For purposes of clarity, and to preserve in confidence the identities of the parties, we shall refer to the parties by first name only. *See* Iowa Supreme Court Rule 8.3; Iowa Code § 232.147 (1987).

2. *See generally* Iowa Code §§ 232.61—.103 (1981).

April 8, 1982. Although records indicate that Kelvin did not comply with what officials had asked of him in order to gain custody of Isaac, Kelvin was awarded custody by the court on May 13, 1982. At the time Kelvin was not yet divorced from his wife Elizabeth, but was living with Rebecca in Des Moines.

On February 16, 1983, Rebecca gave birth to twin girls, Chantelle and Elnora. Kelvin was the father of the girls. On June 18 of that year, Kelvin was divorced from his first wife, Elizabeth. Kelvin and Rebecca were married twelve days later.

The Department of Human Services (DHS) and officers of the Polk County juvenile court monitored the family by order of the court and reported that before and after the twins were born, the relationship between Kelvin and Rebecca was difficult, marked by financial problems, physical and verbal fighting, numerous moves, as well as psychiatric and physical illness. Homemaker services were provided the family by DHS beginning in the summer of 1983.[3] Both parents continued a pattern of hospitalizations for mental illnesses and both required medication for these problems.

In December 1983 through June 1984, the children were cared for in the home of Kathy Barnes where she operated a day care center.

On September 20, 1984, DHS was notified that Kelvin was neglecting the children. It was discovered that Kelvin was taking medication for emotional instability and at times was unaware of his surroundings or of the needs of the children. In one particular instance, Kelvin was unable to recognize that one of the twins was bleeding from the rectum and it was Kelvin's father who eventually sought treatment for her. As the investigating social worker concluded, "Because of [Kelvin's] mental problems, he [was] not able to provide supervision, medical needs or other today needs of the children."

On November 4, DHS received another report concerning the family. During a hospital visit to treat a wrist injury, Isaac was discovered to have venereal warts (condyloma acuminata) in the anal area. After this discovery, Kelvin related that Chantelle had venereal warts. Elnora was also found to have these warts. It was later determined that warts of this variety when found in children are due to a virus that is transmitted through sexual contact. When confronted with this information, Kelvin denied that he sexually abused any of the children. Kelvin stated that the warts were contracted from a source at the Kathy Barnes day care center. All three children subsequently had the venereal warts surgically removed.

On November 14, Kelvin approached the Polk County juvenile court requesting that the three children be placed in foster care. He explained that Rebecca had left the household and that he needed to be admitted for psychiatric hospitalization. Temporary foster care was provided.

On January 3, 1985, the children were returned to their father's care. Kelvin had by then been released from the hospital and had assured the authorities that he could provide for the children. He agreed to allow DHS and juvenile court authorities to provide services and monitoring.

On January 27, 1985, DHS received a report of suspected sexual abuse involving Elnora. On that date Elizabeth Quinn, a homemaker who had been working with the family, took Isaac and Elnora to see a doctor. Elnora was found to have an ear and an eye infection and was also found to have a small tear in her vagina that was bleeding. She was examined by Dr. Linda Elkema who notified Kelvin of the results of her examination and also filed a child protection investigation referral.

On January 29, Phyllis Franklin, a DHS social worker, visited the Naomi Wright day care center where Isaac was enrolled. It was reported by day care workers that Isaac became extremely difficult when he knew it was time to go home to his father's

---

**3.** "A homemaker-home health aide may be assigned to give care to a child in the child's place of residence. Whenever possible, the services shall be provided in preference to removal of the child from the home...." Iowa Code § 232.80 (1983).

house. This behavior was peculiar for a child of his age. Teachers also reported that when it was time for the children at the day care to take a nap, Isaac would refuse to sleep in the dark and would instead lie in the lighted parts of the room.

On February 4, 1985, DHS was notified of an alleged incident of sexual abuse concerning Isaac. On that date, Ann Wellander, a therapist from Iowa Children and Family Services (ICFS) reported that Isaac, who at the time was approximately three years and two months old, was displaying sexual behavior in his therapy sessions that strongly indicated that he had been sexually abused. The therapist described two therapy sessions as follows:

[Isaac] drew one free scribble drawing, naming it monster. I did the cage technique, doing another scribble drawing, putting a cage on it. Isaac did not want to draw any more and went to doll play. He picked out small male doll, identifying as himself, and a large male doll identified as "monster". He pulled the small male doll's pants down and said "pee", pointing to the penis. He stated "monster eat pee." He then placed the large doll's mouth over the Isaac doll's penis, making eating mouth noises. Suddenly, Isaac appeared scared and threw the "monster" doll in a container, wanting me to put the lid on tight, pretending the monster was in the cage....

Doll play: Isaac picked up the dolls previously chosen in the last session—the large male doll as "monster" and the small male doll as "Isaac". He placed the Isaac doll on a doll play bed and covered the doll with a blanket, saying "monster come." I asked if the monster comes when he's in bed and he said yes, stating, "Monster come. I'm in bed. Its dark." I asked him what would happen if the monster came. He took the large male doll and said "Kiss me." I asked him to show on the Isaac doll where he gets kissed. Isaac took the large doll and pretended it was kissing Isaac doll's face. Then he moved the large doll's

mouth down over the penis of the undressed (Isaac immediately undressed the doll when first started playing with it) boy doll, saying, "He touch it—my pee—with his mouth." Then he said, "Monster go like this" and demonstrated with his own self by putting the boy doll's penis in his mouth and biting it. I asked him if the monster touched him anywhere else on his body, and Isaac said "on butt." He turned the boy doll over and put his finger in the anal opening. Then he pulled the large male doll's pants down, exposing the penis, and placed the large doll on top of the Isaac doll with the large doll's penis over the bottom area of the Isaac doll. He said, "he hurt my butt." and pointed to his own bottom. I asked him what the monster's name was, and he said, "Daddy." I asked him if his daddy touched his bottom with his pee, and Isaac nodded yes. I asked him if his daddy touches his pee with his mouth, and Isaac nodded yes. Then Isaac suddenly wanted to leave the room.

After receiving this report, representatives of ICFS, DHS, and Polk County juvenile court met in order to discuss the family and to devise a plan for the care of the children in the immediate future. At this meeting, it was determined that Kelvin often left the children with irresponsible sitters and that Kelvin had given conflicting explanations when asked about the children's care. These workers also noted that Kelvin had neglected to return the twins to doctor appointments as directed to follow up the removal of the venereal warts.

On February 22, 1985, a second CHINA [4] proceeding was commenced and the children were removed from the custody of their father and placed in temporary foster care. A temporary removal hearing was held in March 1985.[5] Kelvin introduced evidence at this hearing that an employee at the Kathy Barnes day care center, had molested two other children at the center. After hearing this and other evidence, the juvenile court determined that the three

4. See generally Iowa Code §§ 232.61—.103 (1983).

5. See Iowa Code § 232.95 (1983).

children should continue to be temporarily removed from their father's custody and remain in foster care in the custody of the DHS. Kelvin was allowed to visit the children in both supervised and unsupervised settings.

On May 22 another suspected incident of sexual abuse was reported. Following an unsupervised visit with the children by Kelvin, the foster mother reported that the twins were found one morning naked, one lying "spread eagle" on the floor, and the other twin sitting on her genital area bouncing up and down. When asked where they learned this behavior, Chantelle responded that "Daddy Kelvin" taught them. (At this time the twins referred to their father as Daddy Kelvin in order to distinguish between their natural and foster fathers.) Later that morning Elnora stated that "Daddy hurting my butt."

Following her report of this behavior, the twins' foster mother reported that after the first unsupervised visit with Kelvin, one of the girls returned with redness in the buttocks and genital area. She also complained and cried when she urinated. Following the same unsupervised visit, the foster mother also noticed the twins pulling one another's pants down and playing with each other's genital area. In the previous month that she had cared for these girls in which no unsupervised visits between Kelvin and the children took place, the foster mother had not observed this kind of conduct from them.

Corresponding with the unusual behavior the twins exhibited in May 1985, Isaac, who at the time was placed in a different foster home than his sisters, was also exhibiting unusual sexual behavior. Isaac's foster mother reported that after a visit with his father, Isaac regressed in his toilet training and "did a lot of acting out" in a sexual nature at home and at day care.

Phyllis Franklin, a DHS worker, later met with Dr. David Schor, an associate professor in the Department of Pediatrics at the University of Iowa, and chairman of the Child Abuse and Neglect Subcommittee at University Hospitals. Dr. Schor was informed of the twins' medical and behavioral history and Franklin described for him the twin's recent sexual behavior. The doctor concluded that given the age of these girls, they would have to have had direct sexual contact or have closely observed sexual acts on a repeated basis to have been able to reenact the same behavior discovered by their foster mother. Following this conference, Franklin concluded her May 22, 1985, investigation report by stating that "based on the information received this worker had no other recourse but to name [Kelvin] as the perpetrator based on the fact that he was solely the only parent with the children on the 19th of May and that the children's behavior was observed early on May 20, 1985. Either [Kelvin] is guilty by co-mission or omission...."

An adjudicatory hearing [6] was held on July 25, 1985, and on August 15 an order was entered by the court that Isaac, Elnora and Chantelle were children in need of assistance as defined in Iowa Code section 232.2(5)(c)(2) (1983) [7] and that they should remain in the custody of DHS for temporary foster care placement. Kelvin and Rebecca were afforded the opportunity to demonstrate their desire and ability to regain custody of the children by complying with the terms of a parent contract.

On July 30, Kelvin underwent a complete psychiatric evaluation as requested by the juvenile court. Kelvin was examined by Van C. Owens, a clinical psychologist at Broadlawns Medical Center. The psychologist's report noted Kelvin's extensive history of psychiatric treatment that included at least nine separate hospitalizations. Kelvin

---

6. *See* Iowa Code § 232.96 (1985).

7. Iowa Code section 232.2(5)(c)(2) provided:
   *"Child in need of assistance"* means an unmarried child:
   ....
   (c) Who has suffered or is imminently likely to suffer harmful effects as a result of:

   ....
   (2) The failure of the child's parent, guardian or custodian to exercise a reasonable degree of care in supervising the child.
   (Emphasis in original.)

had been diagnosed in the past as having chronic anxiety, recurrent major depression, histrionic personality disorder, and acute anxiety among other conditions. A number of medications were previously prescribed for Kelvin and he had been involved in individual psychotherapy, group psychotherapy, and stress management. He had seen a variety of therapists. Following a complete evaluation, the psychologist concluded:

[Kelvin's] general tendency to be emotionally unstable and unpredictable does not put him in an optimistic perspective to effectively meet the needs of his children. His tendency to be rather self-centered and ego-centric may result in him focusing more on his needs than the needs of his children. As such any consideration to restore this patient's custody of his children should be subsequent to a sustained and successful therapeutic contract.

These conclusions were corroborated in a separate psychiatric evaluation by Dr. Karl Northwall dated January 29, 1986, in which the following conclusion was made:

In my opinion his multiple psychiatric hospitalizations alone would indicate that he is not particularly stable. At the conclusion of my evaluation I would also have serious reservations about his ability to parent. I would wonder if his needs were being met by having the children as opposed to the children's needs being met by his having them.

On September 20, 1985, Kelvin did enter into a "Parent Contract" with representatives of DHS and juvenile court authorities. Kelvin complied for a time with the obligations of the contract and a February 6 DHS report noted that he was very cooperative and making "positive progress," though it was felt that there were still "essential issues that he must address before he can offer the children a secure and stable environment in the future."

On February 7, 1986, the children were confirmed by the court to be children in

need of assistance and placement was continued in a foster home.[8]

As required by the parent contract, Kelvin obtained psychiatric evaluations and followed them up with counseling with Dr. Pam Holliman through the Pastoral Counseling Center. In May 1986, however, Kelvin informed DHS that he could no longer afford the counseling and requested a referral for treatment at Broadlawns Medical Center. This referral was granted and appointments were made for Kelvin. The appointments were not kept, however, and Kelvin failed to return to counseling as his contract directed. Similarly, where Kelvin had previously attended play therapy with the children on a regular basis, these sessions became more sporadic as Kelvin scheduled sessions for his own convenience.

During one of these play therapy sessions, Isaac reportedly asked Kelvin if he remembered coming into his room at night and holding Isaac's hands over his head. Isaac also asked, "Can I sleep with you Daddy?" and "Daddy could I go to bed with you?" During one session, Isaac reportedly spontaneously said to his father, "I didn't tell." On another occasion Isaac asked his father if he still had the monster. On each occasion, Isaac resisted questions from both the therapist and Kelvin asking him to explain what he meant. Kelvin later explained that Isaac referred to nearby construction cranes as monsters.

On June 25, 1986, Kelvin notified DHS that his friend Shelly was going to help care for the children when they were returned to his custody. Shelly, who was born in 1960, had three small children of her own.

Kelvin continued to neglect his counseling, and visits with the children became more erratic. On October 2, 1986, a meeting was arranged between various officers and Kelvin to give Kelvin a visitation schedule and to clarify what was expected of him under his parent contract which was by then more than one year old and largely

---

**8.** Following removal of a child from the parent's custody, the juvenile court is required to monitor the placement of the child and to hold review hearings every six months. *See* Iowa Code § 232.102(6) (1985).

unfulfilled. Kelvin failed to arrive at the designated time. Kelvin did later arrive with Shelly to inform the DHS worker that he was being represented by a new attorney. The visitation schedule and contract clarifications were given to Kelvin in writing at that time.

On October 8, 1986, a psychological evaluation was conducted on Isaac, who at that time was four years and ten months old. The evaluation was conducted by Scott W. Shafer, Ph.d. who noted that in a prior psychological evaluation Isaac was found to be somewhat hyperactive and difficult to manage and was also functioning below the levels of other children his age with respect to his communication skills, daily living skills, and socialization skills. In contrast, Dr. Shafer found that since placement in this foster home, Isaac had shown considerable growth in his verbal and social skills. He exhibited affection for his foster mother even though he was not found to be a particularly affectionate child. In day care, however, Isaac remained very aggressive toward others. The doctor concluded that Isaac appeared to be "a youngster with a lot of aggressive tendencies, and some serious social deficiencies". He recommended that Isaac remain in his foster home as well as participate in other group programs to prepare him socially and academically to begin school.

Throughout November and December 1986, Kelvin was allowed a number of unsupervised visits with the children, including overnight and weekend visits. At the termination hearing, Kelvin claimed to have made every effort not to be alone with the children during these visits.

On October 27, 1986, the children were confirmed again by the court to be children in need of assistance. On October 31 the juvenile court ordered a Court Appointed Special Advocate (CASA) for the children.[9]

On December 19, further indicia of sexual abuse was discovered. Martha Smith, the court appointed special advocate for the children, reported one conversation wherein

Chantelle asked about Smith's dad. Smith replied that she did not have a dad anymore and added that the girls have two dads. Chantelle agreed but then said, "But I don't like my Kelvin Dad." When asked why, she replied, "Because he pees me down there," and looked down. Elnora then spoke up to say, "No, he doesn't."

On December 23, Kelvin failed to deliver Isaac to Head Start (a comprehensive, early education program for preschool age children and their families). When an officer of the juvenile court called to inquire if Isaac was ill, Kelvin reportedly became quite upset stating that according to the visitation schedule, there was no Head Start that day and that it was not important that Isaac be there anyway.

On other occasions, Kelvin indicated that when the children were eventually returned to his custody, he would not accept further monitoring and that he would discontinue the programs in which the children were enrolled. Social workers and mental health professionals familar with the family agreed that such a change in programs would result in a serious set back for the children, especially Isaac, who was finally showing signs of progress in Head Start.

On January 27, 1987, in response to the statements made earlier by Chantelle about her father, both girls were examined for signs of sexual abuse by Dr. Rizwan Z. Shah, Director of the Child Sexual Assault Diagnostic Clinic at Broadlawns Medical Center. The examinations included an interview and a physical exam.

In the interview portion of her exam, Chantelle responded freely to the doctor's questions. She identified the regions and anatomy of the male and female dolls that the doctor used. She identified the genitalia on both dolls as "pee-pee" and identified the anal regions on both doll's as "butt". When asked if anyone had touched her on her pee-pee or butt, she replied no. She also denied ever saying that her Dad Kelvin had touched her. In the physical exam Dr. Shah found no external signs of injury.

9. The Court Appointed Special Advocate program is a volunteer program whereby the juvenile court may assign a volunteer to conduct an independent investigation in juvenile cases and represent the interests of a child in any judicial proceeding. See 1987 Iowa Acts ch. 121.

A forensic genital examination was conducted by the use of a colposcope. It was discovered during this examination that Chantelle's hymenal region was distorted, its edges thickened, and that there was a cut through the hymen itself. Dr. Shah noted significant new blood vessel formation in this region and in the area around the opening of the bladder. Dr. Shah later testified that these irregularities indicated multiple trauma to the area and subsequent healing. Because these irregularities were internal without any indication of external injury, Dr. Shah concluded that the trauma was not caused by a fall or incidental contact with toys or other objects. Neither were these injuries congenital. Rather, it was her opinion that these injuries were caused by streching of the hymenal region either by digital insertion or attempted penile insertion.

Elnora was examined by Dr. Shah in the same fashion as Chantelle. Elnora had the same vocabulary as her sister, referring to the genitals as pee-pee and the anal region as butt. When playing with the anatomically correct dolls, Elnora pulled down the pants of the adult male doll and the younger male doll and spontaneously kissed the penis of the male doll.

In the physical examination, Elnora, like Chantelle, appeared to be a healthy, normal child. A forensic genital examination, however, uncovered extensive injury. Dr. Shah observed indications that the inner labia had been torn and the area was unusually red and thick. The hymenal region was also unusually red and there were new blood vessels in the region indicating trauma and subsequent healing. Dr. Shah noted considerable scarring in the region and a complete disruption of the hymen, part of which was missing. Once again, the doctor concluded that these injuries were not consistent with accidental injuries but indicated, in this case, attempted penile penetration and repeated sexual assault. Dr. Shah testified that the sensitivity of this region is like that of the cornea of the eye, and thus, any trauma to the area would be excruciatingly painful. Like the injuries to Chantelle, the scarring and healing of Elnora's injuries indicated that Elnora had been sexually abused between four weeks and six months prior to the examination.

During the course of the examination, Dr. Shah said to Elnora that her machine (the colposcope) told her that somebody had touched her and made her hurt at her pee-pee. When the doctor asked Elnora through a toy puppet if anyone had touched her, she responded to the puppet that her dad touched her at her pee-pee. She did not respond to further questions.

On February 12, 1987, the children were again confirmed by the court to be children in need of assistance.

On February 26, the State filed a petition for termination of parental rights pursuant to Iowa Code section 232.116(5).

The marriage of Kelvin and Rebecca was dissolved in March 1987. Later that month Kelvin was married to Shelly as they were expecting a baby to be born in July. Kelvin moved into Shelly's home with her three children. During this time, he made only sporadic attempts to visit Isaac, Chantelle and Elnora.

At the termination hearing in May 1987, the juvenile court heard testimony from several witnesses including Kelvin and Rebecca. The court also received reports from various persons and agencies professionally involved with Kelvin and his children. It was the unanimous recommendation of these reports that Kelvin's parental rights concerning these children be terminated and that they be permanently placed in a foster home.

CASA worker Martha Smith also recommended that parental rights be terminated.

On July 28, 1987, in its findings, the juvenile court found that the children had been repeatedly sexually abused. The court also found that "[Kelvin] entered into a parent contract outlining his needs to regain custody of the children on September 20, 1985; and that as has been his pattern in the past, [Kelvin] complied minimally with the expectations and blamed everyone but himself for his failure to fully meet the expectations of the contract."

Kelvin's parental rights were terminated by the court, which concluded:

The Court finds that these children would not be safe if returned to [Kelvin]; that the allegations of the Petition have been sustained by clear and convincing evidence that [Isaac], [Chantelle], and [Elnora] have been adjudicated children in need of assistance pursuant to Section 232.96 and their custody transferred from their parents for placement pursuant to Section 232.102 for at least 12 of the last 18 months; and there is clear and convincing evidence that the children cannot be returned to the custody of their father as provided in Section 232.-102.

\* \* \* \* \* \*

The termination of parental rights is in the best interest of the children. The harm and consequences in continuing the biological parent-child relationship is greater than any consequences of termination, and the Petition should be granted.

Kelvin and Rebecca separately appealed the termination of their parental rights and both cases were transferred to the court of appeals. The court of appeals reversed as to Kelvin's appeal, holding that the State failed to carry its burden of proving by clear and convincing evidence that the children would suffer harm if returned to their father.

The State filed an application for further review and was joined by the guardian ad litem and attorney for the children in its application requesting that the juvenile court order for termination be affirmed. We granted the application.

■ II. *Termination of parental rights.* "This court has often recognized that there exists a parental interest in the integrity of the family unit; nonetheless we are also cognizant that this interest is not absolute, but rather may be forfeited by certain parental conduct." *In re Dameron,* 306 N.W.2d 743, 745 (Iowa 1981). Correspondingly, the State has a duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide

it. *Id.* In regard to this obligation, the general assembly has carefully crafted a legislative framework for State intercession into the parent-child relationship while protecting wherever possible the integrity of the family unit. *See In re D.P.,* 431 N.W.2d 777, 778 (Iowa 1988); *In re A.C.,* 415 N.W.2d 609, 613 (Iowa 1987).

Kelvin contends his parental relationship with the three children should not have been terminated by the trial court.

We begin our analysis with Iowa Code section 232.116(5) (1987) which provides that the court may order parental rights to be terminated if it finds that:

a. The child has been adjudicated a child in need of assistance pursuant to section 232.96; and

b. The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months; and

c. There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102.

■ It is not disputed that Isaac, Chantelle and Elnora previously have been adjudicated to be children in need of assistance and that they have been placed in foster care by DHS for at least twelve of the last eighteen months prior to the termination hearing. Thus, we need only resolve the issue whether the State satisfied the third element of section 232.116(5) requiring clear and convincing evidence the children could not safely be returned to Kelvin's custody.

Iowa Code section 232.116(5) refers us to section 232.102 which in relevant part provides:

Whenever possible the court should permit the child to remain at home with the child's parent.... Custody of the child should not be transferred unless the court finds there is clear and convincing evidence that:

a. The child cannot be protected from physical abuse without transfer of custody; or

b. The child cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance and an adequate placement is available.

Iowa Code § 232.102(4) (1987). Thus, the requirement of section 232.116(5)(c) is met when there is clear and convincing evidence that conditions continue to exist to consider the child as a child in need of assistance. *In re A.M.S.*, 419 N.W.2d 723, 725 (Iowa 1988). "Child in need of assistance", in turn, is defined in part as follows:

*"Child in need of assistance"* means an unmarried child:

   *       *       *       *       *       *

b. Whose parent ... has physically abused or neglected the child, or is imminently likely to abuse or neglect the child.

c. Who has suffered or is imminently likely to suffer harmful effects as a result of:

(1) Conditions created by the child's parent ...; or

(2) The failure of the child's parent ... to exercise a reasonable degree of care in supervising the child.

d. Who has been sexually abused by the child's parent....

Iowa Code § 232.2(6) (1987) (emphasis in original). Proof by clear and convincing evidence of any one of the types of harm described in section 232.2(6) at the time of the hearing is sufficient to support termination. *In re A.M.S.*, 419 N.W.2d at 725 (citing *In re K.L.C.*, 372 N.W.2d 223, 228 (1985)).

In reviewing termination proceedings, we are guided by certain well settled principles:

Appellate review of the proceedings to terminate a parent child relationship is de novo; thus "it is our duty to review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us." We accord weight to the fact findings of the juvenile court, especially when considering the credibility of the witnesses whom the court heard and observed first-hand, but we are not bound by those findings.

Central to a determination of this nature are the best interests of the child. In this connection we look to the child's long range as well as immediate interest. Hence, we consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.

*In re A.C.*, 415 N.W.2d at 613 (quoting *In re T.D.C.*, 336 N.W.2d 738, 740–41 (Iowa 1983)). It has also been recognized that our statutory termination provisions are preventative as well as remedial. They are designed "to prevent probable harm to a child and do not require delay until after harm has occurred." *In re A.M.S.*, 419 N.W.2d at 726 (quoting *In re Dameron*, 306 N.W.2d at 745).

With these principles in mind we review the record to determine whether clear and convincing evidence exists to warrant termination of Kelvin's parental rights.

III. *Termination of Kelvin's parental rights.* On appeal from the judgment of the juvenile court, Kelvin denied, as he has throughout the course of these proceedings, that he sexually abused his children. He argued that a source at the children's day care was the obvious perpetrator of the first instance of abuse that gave rise to the venereal warts in the children and that subsequent statements by the children associating their father with sexual contact were inconsistent and confused. Further, Kelvin contended that since his remarriage to Shelly, he has become able to provide the children with a safe and stable home. Thus, Kelvin argued that clear and convincing evidence did not exist to find that, if custody of the children were returned to him, the children either would be imminently likely to suffer sexual abuse, or that they would be imminently likely to suffer harmful effects as a result of his inability to provide adequate supervision. The court of appeals agreed. On further review, we

make an independent de novo review of the record.

A. *Kelvin's ability to adequately provide supervision.* On November 14, 1984, Kelvin voluntarily placed the children in foster care. At the time, Isaac was two years and eleven months old. The twins were not quite one year and nine months old. Kelvin was admittedly emotionally unable to care for the children and sought foster care for them while he was hospitalized for psychiatric treatment. Since that time, Kelvin has undergone sporadic treatment for his psychiatric condition from a number of therapists. His treatment has included a number of prescription drugs. By the time the termination hearing was held in March 1987, however, there was no credible evidence to establish that Kelvin was any more stable or capable of responsibly parenting Isaac, Chantelle, and Elnora, than he was in November 1984.

Although Kelvin occasionally attempted to seek treatment for his psychiatric condition and in part complied with his parent contract with DHS, it is evident from a review of the record that Kelvin did not follow through with these early efforts. Kelvin often resisted counseling and missed appointments. He habitually changed therapists, thus impeding any progress that may have been made. On one occasion Kelvin signed and later destroyed releases for the juvenile court to receive reports from a psychologist. Kelvin failed to comply with the provision of the parent contract that directed him to attend any therapy sessions that the children may have, thus impeding any progress that the children may have made.

The children are regarded as very demanding of supervision and attention. In the past, Kelvin has been emotionally unable to meet these demands and has on different occasions abdicated the responsibility to his family, his neighbors, social service professionals and State agencies. Now remarried for the third time, Kelvin claims he is able to meet those needs of the children that proved too much for him in the past. Although his new spouse says she is able to accept these three children in her home with her other four children, we are not convinced that Kelvin is now able or in the future will become able to provide the care and supervision that Isaac, Chantelle and Elnora require. *See In re C.W.,* 342 N.W.2d 885, 888–89 (Iowa App.1983) (despite fact that natural mother had moved in with maternal grandmother and was beginning to show signs of progress toward stabilizing her life, past evidence indicated that such efforts were unlikely to be sustained).

Furthermore, Kelvin has indicated that he would not allow supervision or monitoring once the children are returned to his custody and has stated that he intends to remove Isaac and the twins from remedial programs in which they have been enrolled. Kelvin has frequently caused Isaac and the twins to miss appointments with doctors, therapy and day care. This court in the past has considered not only the mental disability of the parent, but also the special needs of the child in determining whether the parent is capable of providing for the needs of that child. *See In re A.M.S.,* 419 N.W.2d at 734. These considerations are echoed by the recent amendment to Iowa Code section 232.116 which, although not in effect when this case was tried, reaffirms the approach this court has taken with respect to the child's needs. The amendment in relevant part provides:

> . . . .
>
> In considering whether to terminate the rights of a parent under this section, the court shall give primary consideration to the physical, mental and emotional condition and needs of the child. Such consideration may include any of the following:
> a. Whether the parent's ability to provide the needs of the child is affected by the parent's mental capacity or mental condition. . . .

1987 Iowa Acts ch. 159, sec. 6.

Professional opinions offered throughout these proceedings make it clear that Isaac is presently a child who exhibits behavioral problems, lacks the social and academic skills typically found in children his age, is "full of aggressive tendencies" and will continue to need specilized care. The sin-

gle bright spot in Isaac's profile is the progress he has made in his foster home and the affection he has conveyed for his foster mother. As for Chantelle and Elnora, although they presently are reported to be bright, active children, one professional ominously forecast that the true depth of the psychological trauma that each has endured will not manifest itself until they approach pubescent ages. Given his reluctance to allow continued assistance from social service agencies and his willingness to remove the children from remedial programs, we are convinced that Kelvin is not capable of meeting the special needs of the children.

Thus, we hold clear and convincing evidence exists to support a finding that the children will suffer harmful effects due to Kelvin's inability to exercise a reasonable degree of care in supervising them. *See In re E.J.R.*, 400 N.W.2d 531, 534 (Iowa 1987) (despite father's promises and expressed love for children, his desultory performance as their caretaker and provider dictated termination of his parental rights).

We make this conclusion without even addressing the most obvious deficiency in Kelvin's past performance in supervising these children; that being the fact that Kelvin has consistently been unable to protect these children from repeatedly suffering sexual abuse.

B. *Sexual abuse.* It is beyond dispute that the children have been the victims of repeated instances of sexual abuse. This is the unmistakable conclusion based upon physical examinations of the children, statements made by each child, and the unusual sexual behavior exhibited by the children. Kelvin has consistently maintained that he is in no way responsible for the abuse these children have suffered. Rather, Kelvin has pointed to the children's day care, the foster home and elsewhere as probable sources of the sexual abuse.

This argument ignores the one common factor to each incident of detected sexual abuse. Each incident occurred or was discovered, either when the children were in their father's custody, or shortly after a period in which the children were entrusted to their father's care. All three children were in their father's custody during the period in which it was discovered that the children had contracted venereal warts, a condition that was indisputedly associated with sexual abuse in children. Elnora was in her father's care at the time the tear in her vagina was discovered. The reported instances of unusual sexual behavior by Isaac and the twins arose following unsupervised visits with Kelvin. Similarly, the genital injuries to Chantelle and Elnora were documented to have occurred during a period in which Kelvin was allowed weekend and overnight visits with the girls.

These indications that Kelvin is responsible for the sexual abuse suffered by the children are strongly corroborated by statements from the children associating their father with the sexual abuse. Remarkably, each child on separate occasions made statements which implicated Kelvin as the perpetrator of the sexual abuse. Given the fact that these children were so young as to be barely verbal when some of these statements were made, it is not surprising that some inconsistency exists. Furthermore, each child on occasion has exhibited a genuine reluctance to speak to interviewers concerning their father or discuss in any detail his physical contact with them, indicating the children had been warned against "telling".

As one case worker concluded, the evidence clearly indicates that Kelvin is responsible for the children's sexual abuse either by commission or omission. It was the testimony of no less than five separate persons professionally involved with this family that they believed Kelvin sexually abused his children. Based upon our de novo review of the record, we hold that there was clear and convincing evidence before the juvenile court to determine that Isaac, Chantelle, and Elnora were sexually abused by their father. *See In re E.J.R.*, 400 N.W.2d at 534 (sexual abuse substantiated based upon the ages of the two children involved, the consistency and the spontaneity of their descriptions of the abuse, one child's persistent sexual behav-

ior toward other children, and the other child's depression and anxiety).

IV. *Disposition.* The record supports by clear and convincing evidence the conclusion by the juvenile court that Isaac, Chantelle, and Elnora were children in need of assistance and could not safely be returned to their father's custody. We vacate the decision of the court of appeals and affirm the judgment of the juvenile court terminating Kelvin's parental rights.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.