**In the Interest of B.L.B. and B.R.B., Children.**

**D.B., Father, Appellant,**

v.

**STATE of Iowa, Appellee.**

No. 88–87.

Supreme Court of Iowa.

Feb. 22, 1989.

Rehearing Denied March 16, 1989.

Susan K. Janssen, Winterset, for appellant.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., Kathrine S. Miller–Todd, Asst. Atty. Gen., and Willard Olesen, County Atty., for appellee.

Steven Jensen, Greenfield, for the children.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, CARTER, and SNELL, JJ.

SCHULTZ, Justice.

The father of two children appeals from the juvenile court order terminating his parental rights. The children's mother also appealed from the termination of her parental rights, but she has dismissed her appeal. We initially transferred this case to the court of appeals, which reversed the juvenile court ruling. We then granted the State's application for further review. At the oral arguments on further review, the attorney for the children joined the State in its argument that the decision of the juvenile court should be affirmed. We vacate the decision of the court of appeals and affirm the judgment of the juvenile court.

The children are two girls, born in 1978 and 1980, during the marriage of their natural parents. During this time, the father farmed and the mother, a college graduate, was a homemaker and not otherwise employed. The marriage was marred by conflict between the parents, economic woes and periods of mental illness in both parents, particularly the mother. The marriage was dissolved in 1986, after these proceedings were initiated.

The family has a long history with the Department of Human Services (DHS). In 1980, a report of denial of critical care was investigated, but was determined to be unfounded. No services were provided in response to this report. In 1981, a similar report was made and investigated. These allegations were determined to be founded. The family was referred to a mental health center for in-home treatment and to a child-care center. Treatment was terminated in 1982 when the parents believed that the

services were no longer needed. At that time, the social worker described the home as filthy and messy, with cats running in and out of the home at will. The children wore dresses with no underpants and the family shared one bed.

In 1983, the wife requested day-care services, indicating that her oldest child was not normal and that she could not care for her. The husband rejected the services, however. Both parents refused marriage counseling. Later in the year, at the wife's request she was referred for mental health services.

In 1984, the wife became distraught and was admitted for emergency sessions at the local mental health clinic. She wanted to arrange foster care to protect the children from her husband, however this was not accomplished. The wife admitted herself for hospitalization at a state mental institute. After her release, she had numerous contacts with the DHS.

In 1985, the DHS was again called in when the husband had commenced a dissolution of marriage action and had his wife ejected from the home by court order. The DHS seems to have acted as a go-between for the parents. The mother was still nursing the youngest child, who was five years of age. A copy of a custody evaluation, made at this time, indicated that "both parents were below average in their ability to provide for the girls" and "there were concerns about a placement with either parent." The report also stated that "signs of some degree of emotional disturbance emerged" in the girls.

In the dissolution action, the father obtained custody based on the mother's suicide threats, which involved harm to the children. The mother moved to a nearby city and obtained work. In the meantime, the father cared for the children on the farm, however, the DHS monitored the case and considered juvenile court action. During this period, other people cleaned the home, over the father's objections, because the home had an extremely bad odor. They hauled out rodents and other clutter and commented on the father's poor cleaning habits. Later, the father hospitalized himself for depression and placed the children with members of his family.

The parents of that family asked the DHS to remove the children because of their habits and the consequential effect on their own children. As a result, a petition was filed alleging the children were in need of assistance as defined in Iowa Code sections 232.2(6)(b) and 232.2(6)(i). On December 4, 1985, the juvenile court determined the children to be in need of assistance based on its finding that (1) the parents neglected the children by the long-standing lack of hygiene in their home and (2) the parents had sexual activities in the presence of the children which had harmful results on the children. After a dispositional hearing on March 12, 1986, the children were placed in foster care. In its order, the court noted that it had studied the psychological evaluation by the mental health center and the psychiatric assessment of the father. All parties stipulated to the temporary foster home placement.

At subsequent hearings neither parent seriously challenged the continued foster home placement. In August, 1986, an order in a review hearing noted that the parents agreed to the continued temporary placement. While the mother later applied for a change in foster homes, the father in May, 1987, filed an application which sought to prevent it. Although there has been a change in foster homes, the children have remained in foster care from November of 1985 to the present time.

The children adjusted very well to foster care and have made excellent progress. They have extremely high IQs and possess a great ability to figure out the subtleties in social relationships.

During the children's foster care, the parents have had the opportunity for numerous visits. The children have both had problems from the visitations. Soon after placement, both children became defiant and confrontational with their father. They demanded to see their attorney to explain their desires and became very resistant to visits with the parents. This behavior pattern has increased and, in August of 1986, the children stated they did

not want to live with their parents. They indicated their fear of their father, claiming they were afraid of being abused by him. The DHS arranged for consultation with a child psychologist and the staff designed numerous plans to reunite the family. After several months of working with the family, the child psychologist felt the efforts were a complete failure. The children did things such as run away from their father during visitation, and one would curl up in a ball, sucking her thumb during therapy sessions. The psychologist concluded that trying to reunite this family was detrimental to the emotional well-being of the girls.

The DHS placed the children in separate homes in an effort to change this joint behavior, although it has not improved. The girls continue to physically resist visitation and express their negative attitudes toward their parents.

In July of 1987, a petition for the termination of parental rights was filed, followed by a lengthy trial in November and December. The court found clear and convincing evidence that the children cannot be returned to the custody of either parent. The court also found that reasonable efforts had been made to prevent or eliminate the removal of the children from their parents, but that neither parent had exhibited the ability to meet the emotional and physical needs of the children. The court concluded that a return of the children to the home of either parent would not be in the best interest of either child. The ruling noted the overwhelming evidence of the substantial and numerous programs offered to the family members, but that both parents had failed to improve their parenting abilities.

The court commented that the father had made some improvement, but that he lacked the ability to communicate, could not handle a conflict with the children, and was unable to control the girls when they insulted him. The court pointed out that the father placed the blame on others and failed to carry out instructions, thus increasing his difficulties in dealing with the children. While the court recognized the strong presumption to place children with their biological parents, it concluded that the evidence showed that it was the parents who had failed, leaving no choice but to terminate the parent-child relationship.

█ We have before us the sole appeal of the father. We recently spelled out in detail the well-settled principles that guide our decisions in termination procedures. *In re D.T.*, 418 N.W.2d 355, 356 (Iowa 1988); *In re I.L.G.R.*, 433 N.W.2d 681, 690 (Iowa 1988); *In re D.P.*, 431 N.W.2d 777, 780–81 (Iowa 1988). We need not reiterate these principles, but note that although the state has an interest in protecting the parent-child relationship and the integrity of the family unit, the best interests of the children are paramount.

Iowa Code section 232.116(5) (1987) allows the termination of parental rights if the child has been adjudicated in need of assistance and custody has been transferred from the child's parents for placement for at least twelve of the last eighteen months. There must also be clear and convincing evidence that the child cannot be returned to the custody of the parents, as provided in Iowa Code section 232.102.

In reversing the trial court, the court of appeals concluded there was insufficient proof that the children cannot be returned to their father. It indicated that the father did an adequate job of parenting in the nine-month period from when the mother was removed from the home by court order until his hospitalization for emotional problems. It also heavily relied on the licensed social worker's report.

█ In our de novo review, we cannot agree with this determination. When the father had total custody of these children, his home was a mess. The youngest child was diagnosed as having nutritional anemia. The father's parenting skills were attacked by numerous experts, including his own physician who stated that his parenting skills were significantly impaired. During foster care, there continued to be incidents such as the father bringing the children's kitten to a visitation and telling the girls they would never get to see it again if the termination is completed.

Without going into great detail, the father has demonstrated over and over again that he cannot meet the needs of the children. A clinical psychologist holding a Ph. D. provided assistance to the family, working toward reuniting the children with one or both of their parents. He and his staff logged seventy-two hours of face-to-face contact, along with innumerable additional meetings and phone calls. In speaking of the father, the psychologist summarized the problem as follows:

> [The father] shows very poor social judgment, tends to project blame onto others, has a very difficult time understanding any contribution he has to difficulties in his environment. His scores suggest very poor conceptual thinking. He tends to be preoccupied with irrelevant details and tends to be very negativistic. This personality pattern is consistent with the diagnosis of a severe personality disorder, something that has been with [the father] for a number of years, and is very difficult to treat, probably is not treatable. I don't anticipate this is going to be something that changes dramatically even with more treatment.

Referring to the children, the same psychologist concluded:

> My fear is that these girls feel totally out of control with regard to the impact that, if you will, the system that we've been here talking about today had on their life. I think that if we were to suggest to these children that in spite of their wishes, in spite of everything that they have been trying to tell us, they nevertheless are going to be forced to live with either [parent], that a very reasonable solution for one of them in the next two to three years may very well be a suicide gesture.

The psychologist also explained that the father was given instructions regarding the girls' needs but "was unable to take that information and apply it in a manner that worked with the girls and it would be extremely frustrating to the girls." He commented that, although it was sad, the girls were in charge in every joint session. He stated the girls "would practically belittle him, would say nasty things to him, and he was absolutely unable to gain a care-taking responsible role in the eyes of the children."

In an effort to reduce the emotional strain on the daughters, the psychologist consulted the father's own therapist and other colleagues in the field. Nobody was able to come up with any way to reunite the family. He finally concluded that nothing else could be done.

The court of appeals relied heavily on the report of a social worker whose credibility is somewhat questionable because she is also the father's personal counselor. She gave some hope that the father might learn to effectively parent these children. She indicated that, because of the parent's "own rigid patterns and the girls' resistance to reuniting with them, there is obviously no quick solution involving the return of these girls to either parent's custody." We agree with the trial court that the best interest of the children dictates more than this. At the time of the termination hearing, the children had been in foster care for 25 months. These children "should not be made to suffer indefinitely in a parentless limbo." *In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987).

The social workers and numerous other professionals have devoted much time and effort in an obviously unsuccessful attempt to reunite this family. They have shown a commendably heightened concern over the fact that the children's rejection of their parents took place after they went into foster care. However, our careful examination indicates that these highly intelligent children arrived at this conclusion due to their parents' activities and problems. But fault or causation for this attitude is not the important issue. We agree with the psychologist's conclusion:

> [T]he major issue is that we are unable to effect significant change with regard to reuniting the children with their father. As it stands right now, there is no relationship there. It is in the girls' best interest to be placed in an adoptive home where their family situation can be stabilized, where their feelings about them-

selves can be allowed to grow and mature in a manner that I do not believe is going to occur if this court does not take a decisive action.

Our review of the file convinces us that the juvenile court was correct when it terminated the father's parental rights. Accordingly, we vacate the decision of the court appeals and affirm the decree of the juvenile court.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.