**IN THE COURT OF APPEALS OF IOWA**

No. 14-1017
Filed October 15, 2014

**IN THE INTEREST OF J.F.,**
**Minor Child,**

**R.F., Father,**
         Appellant,

**J.T., Mother,**
         Appellant.
_____

       Appeal from the Iowa District Court for Bremer County, Peter B. Newell,

District Associate Judge.


       A father and mother separately appeal the order adjudicating their child in

need of assistance.  **AFFIRMED ON BOTH APPEALS.**


       Brett H. Schilling of Schilling Law Office, P.C., Waterloo, for appellant

father.

       Mark A. Milder of Mark Milder Law Firm, Waverly, for appellant mother.

       Thomas J. Miller, Attorney General, Bruce L. Kempkes, Assistant Attorney

General, and Kasey E. Wadding, Bremer County Attorney, for appellee State.

       Beth A. Becker of Tremaine Law, Sumner, and Lana Luhring of Laird &

Luhring, Waverly, for minor child.


       Considered by Danilson, C.J., and Vogel and Bower, JJ.

**BOWER J.**

The mother and father separately appeal the juvenile court order adjudicating their minor child, J.F., in need of assistance (CINA), pursuant to Iowa Code section 232.2(6)(d) (2013). Both parents also appeal the subsequent dispositional order, which removed the "care, custody and control" of the minor child from the father, placing J.F. solely in the mother's care. The father also appeals from the court's order requiring him to complete a psychosexual evaluation. We find the State has met its burden of proving by clear and convincing evidence J.F. was sexually abused by her father. We also find requiring the father to complete a psychosexual evaluation does not improperly shift the burden to him to prove he is a fit parent. Accordingly, we affirm the juvenile court's adjudication of J.F. as a CINA, the removal from her father's care and the order for a psychosexual evaluation.

**I. Background Facts and Proceedings.**

This matter came before the juvenile court after the State filed a petition alleging J.F. to be a CINA. An adjudicative hearing was held on March 21 and March 28, 2014.

At the hearing, J.F.'s school counselor, Emily Thilges, testified that she talked to J.F. on November 19, 2013. J.F. was then six years old. During their conversation, J.F. told Thilges she was concerned about how her father had hurt her brother, who was then eight years old. J.F. stated her father had grabbed her brother's chin really tight and grabbed the front of his shirt.[1] Thilges asked

---

[1] Thilges talked to the brother and observed a scratch on his head which she believed occurred from him being pushed the father.

J.F. if her father had ever done anything like that to her. J.F. responded that her father does not hurt her. During the same conversation, J.F. mentioned a boy at daycare who was mean to her. She told Thilges he "touched my butt and he made my front touch his front, and did a front and backwards rock." She said this occurred while they were both wearing clothes and she did not like it. Then she told Thilges, "I tried to push him away but he grabbed me tightly. I like it when dad touches me but not when [the boy at daycare] touches me because we have the same germs." When questioned when and where her father touches her, J.F. said it happens on the couch, usually in the morning, before her brother and mother wake up. When asked how she was touched by her father, J.F. described her father placing his hands on her body underneath her clothing and demonstrated how he moved his hand up and down vertically between her legs.

Thilges reported this conversation to school administrators and the Iowa Department of Human Services (DHS). The same day, Vera Wallican, a child protective assessment worker with DHS met with J.F. at the school. During their conversation, J.F. also reported to Wallican that her father puts his hand down her pants and underwear and moves his hand up and down. J.F. demonstrated this movement without being asked to. J.F. also talked to Wallican about the incident with the boy at daycare.

Wallican testified about an interview that was conducted of the father at the local police department. She testified during the interview, the father appeared to be sobbing although she did not observe any tears. Finding J.F.'s description of the abuse to be credible, Wallican completed a founded child abuse assessment, which was admitted at the hearing.

On December 5, 2013, Thilges had another conversation with J.F. During this conversation, J.F. told Thilges she had lied about her father touching her and she did not know it would be such a big mess. She indicated she wanted her father to be able to come back home with the family, and was also worried her brother may be forced to leave the family home because the mother is not his biological mother. J.F. became frustrated when Thilges refused to assure J.F. she believed her repudiation.

Thilges testified she has had less contact with J.F. at the parents' request. She also testified that she had a meeting with both parents, a school supervisor, and a school administrator where both parents were upset and adversarial. The parents blamed Thilges for taking this too far, raised their voices, and were aggressive.

J.F.'s therapist testified at the hearing that she has not witnessed any stereotypical signs of abuse. Although they have not discussed the details of abuse, J.F. told the therapist several times she lied. J.F. is sad that her father is no longer around. The therapist also testified J.F. is fearful about being asked questions concerning the incident and frustrated when questions are asked.

J.F.'s daycare provider testified she has not witnessed any sexual acting-out from J.F.

Two Families First employees who supervised visits between J.F. and her father testified. One testified he had not witnessed any disciplinary issues or inappropriate touching during the times of his supervision. The other testified J.F. and her father have a close relationship, and J.F. has a difficult time when

the father has to leave at the end of visits. She similarly testified she has not witnessed anything inappropriate during visits.

Finally, the mother testified. She testified the father has always been a light sleeper, often getting up multiple times during the night, sometimes as many as four times in one night for approximately fifteen minutes each time. She explained the father is a smoker and often smokes a cigarette while he is up. She said J.F. has expressed that her counselor lied and it was the boy from daycare who touched her inappropriately, not her father. The mother also testified that she did not tell J.F. to change her story but acknowledged there was concern at the time that the brother would be removed from the home because he is not the mother's biological child. J.F. was aware of the concerns. The mother explained she had suspicions about the father's use of controlled substances, but it was not until after a physical assault that the father admitted to using controlled substances. She was also aware the father used crack cocaine in 2005 or 2006. The mother stated while she believes J.F.'s allegations concerning the inappropriate touching by the boy at daycare, she does not believe the father sexually abused J.F.

On May 1, 2014, the juvenile court filed an order adjudicating J.F. a CINA, pursuant to Iowa Code section 232.2(6)(d).

A dispositional hearing was held on May 30, 2014. The State recommended the care, custody, and control of J.F. be removed from her father and placed solely with her mother. Both parents resisted the recommendation. The court ordered the father to complete a psychosexual evaluation.

The father and mother appeal.

**II. Standard of Review.**

Our review of an action arising from CINA proceedings is de novo. *In re K.B.*, 753 N.W.2d 14, 14 (Iowa 2008). Of paramount concern is the welfare and best interests of the child. *In re C.L.B.*, 528 N.W.2d 669, 670 (Iowa Ct. App. 1995). We review the record to determine whether the finding of child in need of assistance is supported by clear and convincing evidence. Iowa Code § 232.96(2). We give weight to the juvenile court's findings, but we are not bound by them. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001).

**III. Discussion.**

**A. CINA Adjudication and Removal.**

The mother and father contend the State failed to prove by clear and convincing evidence J.F. was a CINA. The State contends the evidence supports the juvenile court's finding J.F. had been sexually abused by the father, and the subsequent removal of J.F. from the father's care.

We find the State has met its burden. Although J.F. has since recanted her statements, J.F. originally made the allegations of sexual abuse to two separate people. She explained her father's actions in the same way both times and used the same gestures. It was only following her father's move out of the family home and after J.F. learned her brother may be forced to leave the family home that she recanted her statement. Given the magnitude of the disruption to the family we are not surprised by the change in J.F.'s testimony. It is apparent the ramifications of her testimony were shared with her by at least her mother. Our court and others have previously held where families are torn apart, there is great pressure on the child to make things right. *State v. Tharp*, 372 N.W.2d

280, 282 (Iowa Ct. App. 1985); *see also U.S. v. Provost*, 969 F.2d 617, 621 (8th Cir. 1992) ("Recantation is particularly common when family members are involved and the child has feelings of guilt or the family members seek to influence the child to change her story."). We are also convinced because the victim showed a genuine reluctance to speak to others concerning the incident she had been warned against telling. *In re I.L.G.R.*, 433 N.W.2d 681, 692 (Iowa 1988).

While we acknowledge there was no physical evidence of abuse and J.F. has not exhibited any stereotypical signs of abuse, it appears that J.F. was unaware her father's behavior was unusual or wrong. Although the parents suggest it should, we are not persuaded this precludes a CINA adjudication. We affirm the adjudication.

Additionally, because the parents' contention that the removal of J.F. from her father's care should be reversed hinges on the reversal of the CINA adjudication, we affirm the removal as well.

**B. Court-Ordered Evaluation.**

The father appeals the juvenile court's order requiring him to complete a psychosexual evaluation. He contends the requirement improperly shifts the burden to him to prove he is a fit parent. He also contends that insofar as the evaluation may require him to make certain admissions, it is in violation of his Fifth Amendment right against self-incrimination.

The court did not order the father to undergo a psychosexual evaluation until finding the State had met its burden in proving by clear and convincing evidence J.F. is a CINA. Rather than shifting the burden to the father to prove

his fitness as a parent, the court has ordered the evaluation to determine what services need to be offered to facilitate the possible reunification of J.F. with her father.  It is within the discretion of the court to determine what services are to be provided "to the child's parent, guardian, or custodian in order to enable them to resume custody of the child."  Iowa Code § 232.102(7); *see also In re V.B.*, 491 N.W.2d 168, 170 (Iowa Ct. App. 1992) ("Chapter 232 does not allow the juvenile court to grant discretion to DHS and thereby abdicate its responsibility to specify the services with which the [parent] must comply.").

The father also contends the evaluation "often requires the subject to admit to the commission of the alleged actions at issue" and  such a requirement would violate his Fifth Amendment right against self-incrimination.  The father cites no authority for this claim and failed to first raise this claim before the juvenile court.  Thus, we consider it waived.  Iowa R. App. P. 6.903(2)(g)(3) ("Failure to cite authority in support of an issue may be deemed waiver of that issue."); *see also Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

**AFFIRMED.**

Vogel, J., concurs; Danilson, C.J., dissents.

**DANILSON, C.J.** (dissenting)

I respectfully dissent because I do not believe the State has met its burden of proof. I acknowledge the majority's powerful rendition of the facts suggests otherwise. But I view the facts differently.

The testimony of Thilges, the school counselor, is the only evidence that substantiates the adjudication. Even when the very young J.F. visited with the DHS child protective assessment worker—with the school counselor present—the child did not repeat any of the alleged earlier comments until prompted by the school counselor. There was no other hint of inappropriate touching or any stereotypical signs of abuse being exhibited by the child. Moreover, the child's alleged answers to the school counselor's questions are also subject to some interpretation concerning what alleged contact or touching occurred.

When interviewed by a forensic interviewer at the Child Protection Center, J.F. denied that her father ever touched her inappropriately. A physical exam also did not provide any evidence of inappropriate touching. Additionally, J.F.'s therapist, Jorgenson, testified she had not witnessed J.F. exhibiting any stereotypical signs of abuse. Both Family First workers who have supervised visits between J.F. and her father testified their interactions have been appropriate and J.F. is bonded with her father.

Both parents refute the juvenile court's finding. The mother is an occupational therapist with a BS degree in occupational therapy and psychology. She testified that both J.F. and her brother have asked why Thilges asked them if their father touches their private parts. The mother also testified J.F. has stated several times that she does not understand why Thilges is saying that her father

touched her when it was actually the boy from daycare. Family pressure to repudiate aside, what else could the young child say if no inappropriate touching occurred?

The allegation of abuse also did not gain in credibility when the child abuse assessment worker interviewed the child—where the school counselor was present and had to prompt the child. The child had some understanding of bad touching when the child reported disliking the touching by a boy from daycare. I find it difficult to give weight to prompted statements and generalities in light of the child's many unprompted statements to the contrary and lack of other evidence giving credence to the statement.

Without more, I do not believe the State has met its burden of proving by clear and convincing evidence that J.F. was sexually abused by her father or was imminently likely to be. "Clear and convincing evidence" means there are no serious or substantial doubts as to the correctness of conclusions of law drawn from the evidence. *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). I have serious doubts, and I would reverse.