In the INTEREST OF D.T., D.T., D.T., D.T., M.T., D.T., and A.T., Children,

L.T., Mother, Appellant,

State of Iowa, Appellee.

No. 87–1213.

Supreme Court of Iowa.

Jan. 25, 1989.

Ronald A. Baybayan, Des Moines, for appellant.

Thomas J. Miller, Atty. Gen., and Charles K. Phillips, Asst. Atty. Gen., for appellee.

Considered by HARRIS, P.J., and LAVORATO, NEUMAN, SNELL, and ANDREASEN, JJ.

LAVORATO, Justice.

In this child in need of assistance (CHINA) proceeding, the juvenile court adjudicated seven children to be children in need

of assistance. Following dispositional hearings, the juvenile court ordered that the children's custody continue with the department of human services for placement purposes. The mother, but not the father, appealed. We transferred the case to the court of appeals, which affirmed the underlying CHINA adjudications but ordered the district court to take such further evidence as would be necessary to assure the return of the children to their mother's home. We then granted the State's application for further review. Because we think the juvenile court's dispositional orders were correct in all respects, we vacate the decision of the court of appeals and affirm the orders of the juvenile court.

## I. *Background Facts and Proceedings.*

Daniel and Lanelle are the natural parents of the seven children involved in these proceedings: Diana T., born February 20, 1973; Dawn T., born July 1975; David T., born August 31, 1977; DeAnna T., born July 17, 1979; Michael T., born May 6, 1981; Darrell T., born July 13, 1983; and Alicia T., born January 2, 1986. Lanelle is thirty-five and her husband is thirty-eight.

The record evidence before the juvenile court establishes the following facts.

The family first came to the attention of the department of human services (then known as the department of social services) in 1983, when a child abuse report was filed against the parents. The report centered around the parents' refusal to allow David to receive special education after he was diagnosed as needing such help. Additionally, the report was critical of the home environment, describing it as "unsanitary for the children." It was also critical of Lanelle because she would not let a state homemaker come into the home or have contact with the couple's newborn child.

A second child abuse report was filed in January 1986. This report was based upon extensive unsanitary conditions in the home, a failure to provide adequate food and clothing, and a lack of supervision of and unsafe conditions for the children in general.

The incident leading to the second report involved the birth of Alicia T. The birth occurred at the family home. Problems with the birth occurred, so city fire and police officers were called to the residence. Because of debris, clothing, and garbage cluttering the house, the officers had to clear a path to get to Lanelle in her bedroom. The child abuse investigative unit of the department of human services received a referral from the city because of the condition of the home.

After Alicia's birth, Lanelle and the child were taken to the hospital. The other children were left temporarily in various homes. In their absence approximately twenty-five townspeople cleaned the home. They worked for three days, scrubbing walls with wire brushes and hauling out approximately five truck loads of debris and trash. They made bunk beds for the children and equipped them with mattresses. Furniture was donated for the living room. Because of the debris in the vicinity of the water heater, the home was a veritable fire trap, a condition the fire department had been complaining about for more than a year.

At this juncture D.W. Myers, a child protective social worker, was assigned to the case. He began working in conjunction with Polk County juvenile authorities to improve living conditions in the home. On February 14, 1986, he had his first contact with Lanelle. Lanelle refused to allow Myers into the home. She said she had been visited by an investigative worker on another matter earlier that day and that she was not prepared to deal with two social workers in one day.

Myers opened a case file on the family and contacted the Iowa Children Family Services to initiate homemaker services. Coincidentally, on March 4, Daniel called Myers to request these same services. That day Myers returned to the home. Lanelle was angry with Daniel for bringing Myers into the matter. Nevertheless, Daniel signed an application for the services. This prompted further hostility from Lanelle, who told Daniel to leave the house

because she had the State and a homemaker there and did not need him.

In March 1986 Lanelle and Daniel, at the insistence of Myers, signed a contract with juvenile authorities, agreeing to a number of conditions to safeguard their children. Among other things, the couple agreed to cooperate with and allow monthly visits from the child protective treatment worker, to allow a public health nurse to visit the home weekly and examine the children, to consider marital counseling, and to keep the home in a safe and sanitary condition. The contract specified that "failure to comply with the agreement may result in further court action."

According to Myers' testimony, the couple failed to abide by the contract in the months that followed. From March through July 23, Myers visited the home about a dozen times. On each visit he found deteriorating conditions in the home.

On July 23 Myers made an unannounced visit. Dirty clothes, food, garbage, and dirt from outdoors covered the floors. The children were generally filthy. The children were allowed to play in the street and in culverts containing raw sewage. Other testimony revealed that the townspeople were so concerned about the children playing in the street that they had installed elevated road bumps to slow motorists. The house was fly-infested, and beds were urine-soaked. Generally, conditions had regressed to what they were prior to the community clean-up of the home. These conditions resulted in a third child abuse referral. The report was based on an allegation of denial of critical care.

The next day, a child protective treatment worker made an unexpected visit to the home to investigate the child abuse report received the day before. Lanelle refused to allow the worker into the home or discuss the report's allegations. She also refused to agree to a future home visit by the worker and ended the conversation by slamming the door in the worker's face.

In early August, Myers and Bert Aunan, a Polk County juvenile court officer, made an unannounced visit to the home. The two found the home in a filthy condition.

Lanelle told them the children had head lice. The officers told Lanelle that she had to do some specific tasks to get the home in a livable condition and that they would be back the following week.

True to their word, the officers returned the following week and again on August 22 and August 26. On the last visit, they found the house clean.

On September 14 the authorities received a fourth child abuse report, this time involving the two oldest daughters, Diana and Dawn. An investigation revealed that the father, Daniel, was the perpetrator. Daniel, who had been hospitalized in the past for psychiatric problems, voluntarily committed himself for psychiatric help. Daniel readily admitted the sexual abuse of his two daughters to a psychologist who examined and psychologically tested him.

The child protective treatment worker who had investigated this latest child abuse report recommended that CHINA proceedings be filed on behalf of Diana and Dawn. That was done on September 25. The petitions alleged the two children were children in need of assistance within the meaning of Iowa Code section 232.2(6)(d) (1985) (sexual abuse by parent). Several days later, the juvenile court issued a no contact order, forbidding Daniel from "visiting, seeking, speaking to, communicating with, or being in the immediate vicinity" of his two daughters, or being in their "residential dwelling."

On September 30 Myers again visited the home. Janet Simmons, a homemaker services worker, accompanied Myers. Lanelle was not home. Several of the children were, and they allowed the two into the home.

Myers found that conditions in the home had returned to what they were prior to the visits he and Aunan had made in August. The house was once again fly- and louse-infested; filth covered the floors; the bedrooms were dirty and cluttered; gnats were swarming around the kitchen; and the refrigerator contained rotten food. Myers left Lanelle a message that Sim-

mons would serve as a homemaker and that she would return the following week.

The following day Lanelle called Myers and was resistant to homemaker services. Myers informed Aunan of Lanelle's resistance and sought Aunan's help in convincing Lanelle of the necessity for the services. Aunan sent Lanelle a letter to that effect.

On October 7 Simmons went back to the home. In Simmons' view, the house was in worse condition than before. A jar of milk was on the kitchen table. Dead flies and gnats stuck to the top of it. A slop bucket full of garbage was on the kitchen floor. The baby, who by then was crawling, put her hands on the bucket and pulled herself up. Once on her feet the baby put her hands into the bucket and then into her mouth—she was actually eating from the bucket.

In the bathroom, Simmons found feces smeared all over the wall near the light switches. The toilet lid and toilet were also smeared with feces. The bathtub and floor were full of dirty clothes. In the homemaker's words, "it was just outrageous."

The homemaker returned the following week. She found Lanelle outside picking up debris and garbage in the yard. Both went into the home and proceeded to the basement, where Lanelle was doing laundry. A repairman was working on the furnace. At this point several of the children came downstairs, took the hose off the washtubs, and flooded the basement. The repairman was concerned that the children and Lanelle, who were all barefooted, would be electrocuted. The warning did not deter Lanelle, who by this time was upbraiding the homemaker for not helping her with the household chores.

On October 21 Simmons made a return visit to the home. She found that the basement was still flooded. Conditions had not improved. Lanelle continued her resistance to Simmon's suggestions and finally told her to leave. Simmons reported the condition of the home to Myers, who instructed her to make a child abuse report. Myers also instructed Simmons not to re-turn to the house. The homemaker did not return until the following March.

During one of Simmons' visits, Lanelle talked about her husband's sexual molestation of their two daughters. Lanelle felt the reason her husband had sexually molested the daughters was that Lanelle was not there when he needed her. From the tone of Lanelle's statements, the homemaker got the impression that Lanelle was blaming the daughters for what had happened.

On December 1 CHINA petitions were filed on behalf of David, DeAnna, Michael, and Darrell. The petitions alleged the children were in need of assistance as defined by Iowa Code section 232.2(6)(c)(2) (lack of reasonable supervision) and (g) (failure to supply food, clothing, and shelter).

The allegations of each petition were identical and recited that the child

has suffered and is imminently likely to suffer harmful effects as a result of the failure of the child's parents to exercise a reasonable degree of care in supervising the child, and in that [the] parents have failed to exercise a minimal degree of care in supplying the child with adequate clothing and shelter and refuse other means made available to provide such essentials to wit: Social services and the juvenile office have been gravely concerned about this family since 1983; in spite of services and active intervention by community resources, there have been continuing problems with extremely unsafe and unsanitary living conditions, the emotional instability of both parents, the dangerous lack of supervision of the children, who are often found in the street, and domestic violence; the parents have failed to utilize the offered services and have been hostile and uncooperative with workers; they have failed to comply with oral and written agreements made with the Child Protective and Juvenile Court Workers; recent CHINA petitions were filed on the two oldest siblings because they were sexually molested by their father; the father is mentally unstable and has been hospitalized on more than one occasion; the mother is mentally ill but

refuses treatment; these children are living in an environment where they are inadequately clothed or sheltered; where they are exposed to disease and physical hazards and where they have no adequate or mentally stable caretaker; without this court's immediate intervention, the child is at high risk of suffering further physical and emotional harm.

On December 11 Lanelle stipulated that Diana and Dawn were children in need of assistance within the meaning of Iowa Code section 232.2(6)(d). Daniel offered no evidence to rebut the allegations of the petitions. Based on statements of the two children and other exhibits received into evidence, the juvenile court found that the allegations of the petitions were proven by clear and convincing evidence. It then adjudicated them to be children in need of assistance, continued the no contact order against their father and ordered a psychological evaluation of him, ordered that the two children receive counseling, and placed them in the custody of their mother. Lanelle was ordered to cooperate with the department and Christine Bisignano, who was assigned as the two daughters' juvenile court officer.

On March 16, 1987, a fifth child abuse report was received by the department of human services. The report concerned all seven children and alleged denial of critical care. The report grew out of a visit to the home by Bisignano on March 12. At first Lanelle would not allow the officer into the home. Bisignano left and returned with Lanelle's attorney and gained entrance. Concern about lack of any recent information regarding conditions in the home, as well as information that the father had been there, prompted Bisignano's March 12 visit.

The stench coming from the home was so foul that Bisignano could smell it outside. Garbage was all over the front yard. Once inside, Bisignano met the homemaker, Simmons, who had arrived earlier. Both described deplorable conditions. Human feces were on the kitchen floor. One of the children was playing in it. The slop bucket was on the floor, where the baby had access to it. As before, the child was eating out of it. Before Bisignano returned, Simmons had observed Lanelle throwing a considerable amount of garbage out the side door. Although it was March, all of the children were barefooted. An orange beverage with debris floating on top of it was on the kitchen table.

On March 13 Bisignano, armed with this information, obtained a juvenile court order allowing temporary removal of all seven children. Two deputies and a child protective worker, Cheryl Wild, accompanied Bisignano to the home. Following Lanelle's refusal to allow the four into the home, the deputies had to force the door open. The three youngest children were there. Lanelle immediately grew violent, screaming at Bisignano that she was an "evil bitch" and yelling at Michael not to go with the officer because the officer would kill him. Lanelle had to be restrained with handcuffs as Bisignano took the three children with her.

All of the children were taken to the hospital for physical abuse exams before being placed in foster care. All but one were found to have head lice. At the hospital Wild interviewed Diana, the oldest daughter, who said she was glad to be in foster care because she had been thinking of running away and did not want to return home. Diana confirmed the presence of her father in the home since the no contact order had been issued. She estimated that he had been in the home one time per week since the order. Three of the younger children also confirmed the presence of their father in the home.

On March 16 a petition was filed on behalf of Alicia T., the baby, alleging that she was a child in need of assistance as defined by Iowa Code sections 232.2(6)(c)(2) and (g). The next day the juvenile court, by order, approved the juvenile court officer's temporary removal of the children from their home on March 13. The court also placed the children in the custody of the department of human services for purposes of emergency foster care. Finally, the court set a hearing to take place on

March 19 regarding the continuation of the temporary removal.

On March 19 and 24, the juvenile court heard the following matters: an adjudicatory hearing on David, DeAnna, Michael, and Darrell; a dispositional hearing on Diana and Dawn; a pretrial conference on Alicia; and a continued removal hearing on all seven children.

On April 3 an adjudicatory hearing was held as to Alicia. It was stipulated that evidence presented at the March 19 and 24 hearings could be received and considered as the evidence for the adjudicatory hearing on Alicia.

In an order entered on all of these matters on April 9, the juvenile court made a number of findings and entered various orders. The court found that Lanelle had permitted Daniel to come into the home and have access to Diana and Dawn, in violation of the no contact order. It confirmed that the two were children in need of assistance within the meaning of Iowa Code section 232.2(6)(d). The court placed them in the legal custody of the department of human services for foster care placement and ordered that the placement be reviewed in six months.

As to David, DeAnna, Michael, Darrell, and Alicia, the court found that the allegations of the CHINA petitions were established by clear and convincing evidence. It further found that the continued removal of the children was necessary to avoid imminent risk to their health. The court adjudicated the five children to be children in need of assistance, ordered that their temporary removal continue pending a dispositional hearing, and continued their temporary legal custody with the department of human services.

Additionally, the court continued the no contact order, ordered that Diana and Dawn continue in therapy, and ordered that the parents enter into a parental contract "to demonstrate their ability and desire to regain custody of the children." Finally, the court, over Daniel's objections, ordered the hospital to furnish the court with a report of Daniel's psychological evaluation.

On the same day, the court entered a separate order setting a dispositional hearing on June 29 for David, DeAnna, Michael, Darrell, and Alicia. The hearing was held on that date. In an order filed the same day as the hearing, the court found that

both parents have flagrantly permitted the court's no contact order to be violated. Cooperation with service providers has been minimal. The court would point out to these parents that the children have been removed from their home for almost one-third of a year; and if they are going to avoid living in jeopardy of having their parental rights terminated, they must immediately start cooperating with service providers and start making a sincere effort to regain custody of their children.

The continued removal in this case is the result of a determination that to return the children to the home at this time would be contrary to the welfare of the children, and that reasonable efforts have been made to prevent or eliminate the necessity for continued removal.

The court confirmed that the five children were children in need of assistance within the meaning of Iowa Code sections 232.2(6)(c)(2) and 232.2(6)(g). It continued their legal custody with the department of human services for placement "commensurate with their needs." Additionally, the order required Lanelle to enter into and abide by the terms of a parental contract, continued the no contact order, refused visitation of the father with the children, and provided that the matter come up for review upon further order of the court.

It is from the June 29 order that Lanelle appeals. The court of appeals affirmed that part of the order adjudicating the children to be children in need of assistance. It reversed that part of the order continuing the legal custody of the children with the department. Finally, the court remanded the case to the juvenile court to "take such further evidence as is necessary to make orders to assure the return of these children to their mother's home and to assure the mother will receive reasonable assistance to help with the household respon-

sibilities." The State filed an application for further review, which we granted.

## II. *Sufficiency of the Evidence Justifying Removal.*

Lanelle challenges the removal of the children from the home and the transfer of their custody resulting from the dispositional orders. She contends the evidence was not sufficient to justify such removal and not sufficient to justify depriving her of their legal custody for temporary placement.

Iowa Code section 232.102 controls the transfer of legal custody after a dispositional hearing. Section 232.102(1) pertinently provides:

1. After a dispositional hearing the court may enter an order transferring the legal custody of the child to one of the following for purposes of placement:

   ....

   c. The department of human services.

Section 232.102(3) pertinently provides:

Whenever possible the court should permit the child to remain at home with the child's parent.... Custody of the child should not be transferred unless the court finds there is clear and convincing evidence that:

   ....

   b. The child cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance and an adequate placement is available.

The order shall, in addition, contain a statement that removal from the home is the result of a determination that continuation therein would be contrary to the welfare of the child, and that reasonable efforts have been made to prevent or eliminate the need for removal of the child from the child's home.

CHINA actions are special proceedings requiring de novo review. *In re J.R.H.*, 358 N.W.2d 311, 317 (Iowa 1984). Though not bound by the juvenile court's fact findings, we give them weight, especially when considering the credibility of witnesses whom the court heard and observed firsthand. *In re I.L.G.R.*, 433 N.W. 2d 681, 690 (Iowa 1988).

The paramount consideration in CHINA proceedings is the best interests of the child. The presumption that a child's best interests will be served by leaving the child with the child's parent, now codified in section 232.1, is not conclusive. It is the duty of the State, as parens patriae, to see that every child within its borders receives proper care and treatment. *In re Welcher*, 243 N.W.2d 841, 843–44 (Iowa 1976).

With these principles in mind, we now determine whether the State proved by clear and convincing evidence the pertinent requirements of section 232.102(3) as set out above.

The juvenile court placed custody with the department of human services, thereby meeting the requirement of section 232.-102(1)(c). Such action also satisfied the "availability of an adequate placement" requirement in section 232.102(3)(b). Left for our determination is whether the State proved by clear and convincing evidence (1) that the children could not be protected from some harm that would justify the adjudication of the children as children in need of assistance, (2) that the presence of the children in the home would be contrary to the welfare of the children, and (3) that reasonable efforts had been made to prevent or eliminate the need for removal of the children from the home.

A. *The two oldest daughters.* As we noted earlier, CHINA petitions were filed alleging that Diana and Dawn were children in need of assistance within the meaning of Iowa Code section 232.2(6)(d). Section 232.2(6)(d) defines a child in need of assistance as one who has been sexually abused by the child's parent. At the subsequent adjudicatory hearing on these petitions, Lanelle conceded both daughters met the definition. Daniel, the father, admitted his sexual molestation of the two children to a psychologist who treated him.

The evidence is uncontroverted that on several occasions Daniel, in violation of the no contact order, was in the home and in the presence of both daughters. Not only

did Lanelle not protest his presence, she actively sought it. She aided and abetted violation of the order. Her feeble attempt to justify her husband's actions leaves no doubt in our minds that she considered the molestations insignificant. More ominous is Lanelle's notion that somehow these two children were responsible for what happened.

At the March 19 dispositional hearing regarding Diana and Dawn, their juvenile court officer recommended that the no contact order continue. The officer's recommendation was based on the father's violation of the no contact order coupled with his lack of sexual abuse treatment. Because of these reasons, the officer felt that the children were at risk of further sexual abuse. A psychological evaluation of the father, completed several months after the molestations, tends to support the officer's concerns. We quote several excerpts from that evaluation:

> Both psychological and psychosexual immaturity is suggested. Patient appears more likely to attempt to have his needs satisfied by his family as opposed to looking outward to his environment.... Patient may have some problems controlling his impulses.... He has many needs that have gone unmet. He appears to relate better to children than to adults. This may in part explain his having sexually abused his daughters.... Patient would benefit from the [Intra Family Sexual Abuse Program] in that it will help him gain insight into his sexual molestation of his children, which he does not appear to be taking total responsibility for (i.e., tends to see this as a way to get back at his wife, rather than as a direct expression of his own sexual needs).

We think the evidence is clear and convincing that Diana and Dawn could not be protected from further sexual abuse except by their removal from the home. We base this conclusion on Lanelle's attitude regarding the sexual molestations, the repeated violations of the no contact order and Lanelle's active participation in those violations, and the father's untreated psychosexual immaturity. Lanelle's tolerance

of the father's presence must be considered against her. *See In re W.G.*, 349 N.W.2d 487, 492 (Iowa 1984), *cert. denied*, 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985).

What we have said also supports the juvenile court's finding that the return of the two daughters to the home would be contrary to their welfare. *See* Iowa Code § 232.102(3)(b). Finally, the juvenile court's no contact order and the juvenile authorities' insistence on therapy for the family constituted reasonable efforts to prevent or eliminate the necessity for the removal of the two children from the home. *See id.* The parents' violation of the order and lack of interest in therapy left the authorities no choice but to seek the children's removal from the home.

Like our statutory termination provisions, we think our temporary removal provisions in CHINA proceedings are designed to prevent probable harm to a child and do not require delay until after the harm is done. Moreover, as in termination proceedings, we think it is appropriate to gauge from the parent's past performance what might happen if a child is returned rather than temporarily removed. *Cf. In re I.L. G.R.*, 433 N.W.2d at 690.

■ **B.** *The other children.* As we also noted earlier, CHINA petitions were filed on behalf of David, DeAnna, Michael, and Darrell on December 1, 1986. On March 16, 1987, a similar petition was filed on behalf of Alicia. The petitions were based on alleged violations of Iowa Code sections 232.2(6)(c)(2) and (g).

Section 232.2(6) pertinently provides:

> 6. "Child in need of assistance" means an unmarried child:
>
> ....
>
> c. Who has suffered or is imminently likely to suffer harmful effects as a result of:
>
> ....
>
> (2) The failure of the child's parent ... to exercise a reasonable degree of care in supervising the child.
>
> g. Whose parent ... fails to exercise a minimal degree of care in supplying the

child with adequate food ... or shelter and refuses other means made available to provide such essentials.

Proof by clear and convincing evidence that the children could not be protected from harm under either section 232.-2(6)(c)(2) or section 232.2(6)(g) would suffice to support their removal from the home. We think, based on our following review of the evidence, that the State met its burden under both sections.

Apart from the head lice experienced by the children, there was no direct proof that any of them suffered harmful effects because of the wretched living conditions in the home. There was, however, abundant evidence of an imminent likelihood that they would.

One need not have gone to medical school to know that the birth of a child amid squalid conditions, eating garbage, playing in raw sewage, and going barefoot in water surrounding electrical appliances are dangerous and unhealthy. The community's collective concern for the health of these children is persuasive evidence that they were in danger. That concern was so overwhelming that on one occasion the community took it upon itself to clean the home. On another, it installed elevated road bumps to give some measure of protection to these children, who constantly played unsupervised in the street.

Overshadowing all of this evidence of deficient parenting skills is Lanelle's lackadaisical attitude toward her husband's sexual abuse of the two daughters. We agree with the following appraisal of the consequences of sexual abuse in the family:

> Termination [of parental rights] is frequently justifiable in cases of physical or sexual abuse. The consequences of physical or sexual abuse are immediately devastating to the child. Courts should therefore consider the likelihood that the child will be a victim of physical or sexual abuse if returned to the family home.

Comment, *Minnesota Adopts a Best Interests Standard in Parental Rights Termination Proceedings: In re J.J.B.*, 71 Minn. L.Rev. 1263, 1289 (1987). Yet, despite the obvious harm the father inflicted on the two daughters, Lanelle not only permitted but encouraged violation of the court's no contact order. She put not only the two victims at risk, but also the other children.

Clearly, returning the children to the home following the June 29 dispositional hearing would have been contrary to the welfare of these children. *See* Iowa Code § 232.102(3)(b).

For over a year, the juvenile authorities and the department of human services workers constantly strove to improve the conditions in the home, protect the children, and improve Lanelle's parenting skills. These were reasonable efforts in our view to prevent or eliminate the need for removal of the children from their home. *See id.* Lanelle's resistance to these efforts was just as constant. Her resistance reached a zenith when, at the June 29 dispositional hearing, she would not agree to allow any of these people into her home without the presence of her attorney. Such resistance is abundant proof that she refused "other means made available" to provide adequate food and shelter for these children. *See id.* at § 232.2(6)(g).

### III. *Disposition.*

Clear and convincing evidence in the record justified removal of the children from the home and a temporary transfer of their legal custody to the department of human services. Unfortunately, more than a year has passed since the juvenile court's dispositional orders. We, of course, have no record as to what has happened since then. Our only recourse is to vacate the decision of the court of appeals and remand this case to the juvenile court to allow it to proceed in the best interests of these children, based upon whatever record is subsequently made before it.

DECISION OF COURT OF APPEALS VACATED; JUDGMENT OF DISTRICT COURT AFFIRMED.