# IN THE COURT OF APPEALS OF IOWA

No. 14-0117
Filed April 16, 2014

**IN RE B.B., T.B., AND R.B.,**
**Minor Children,**

**MARY COWDREY,**
 Guardian ad litem, Appellant,

**STATE OF IOWA,**
 Appellant.
_____

 Appeal from the Iowa District Court for Marshall County, Stephen A. Owen, District Associate Judge.

 The State and the children's guardian ad litem appeal the juvenile court's dismissal of the State's petitions to adjudicate B.B., T.B., and R.B. children in need of assistance. **AFFIRMED.**

 Mary Cowdrey of the Public Defender's Office, Marshalltown, attorney and guardian ad litem for minor children, for appellant.

 Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Jennifer Miller, County Attorney, and Luke B. Hansen, Assistant County Attorney, for appellant State.

 Misheal Meinders, Woodward, for appellee father.

 Considered by Vogel, P.J., and Tabor and McDonald, JJ.

**McDONALD, J.**

The State and the children's guardian ad litem appeal the juvenile court's dismissal of the State's petitions to adjudicate B.B., T.B., and R.B. children in need of assistance (CINA). The State alleges the father forced R.B. and B.B. to punch T.B. and therefore the children should be adjudicated CINA. We conclude the State did not prove by clear and convincing evidence the children should be adjudicated CINA and therefore affirm the order of the juvenile court.

I.

This appeal involves three children, B.B., born in June 2009, T.B., born in June 2008, and R.B., born in December 2006. The basis for the State's CINA petitions was the allegation that the father forced R.B. and B.B. to punch T.B. during the children's visit with the father between August 2 and August 9, 2013. The investigation was initiated after T.B. informed the mother his brothers were forced to punch him in the face, causing his nose to bleed. The mother took T.B. to the doctor because of his complaints of nose pain and because she noticed his nose "was doing a lot of running with mucus." T.B. also told the nurse the father had forced his brothers to strike him. The mother then contacted the Iowa Department of Human Services (DHS), and an investigation was initiated.

Several DHS investigations were performed and follow-up reports completed. The first, dated August 13, 2013, contains the mother's report that the children informed her that, because they wanted to go to the mother's house, this made the father angry and so the father "sat and watched as they had to punch [T.B.]. The children reported that if they didn't punch [T.B.] that their dad told them he would punch them instead." T.B. told the mother "that his nose was

bleeding from being punched in the face. He made comment about 10 drops of blood that came from his nose because of this and some of it was on his shirt." The report also contained the DHS worker's interview with the nurse:

> Nurse George stated that she was given a brief explanation as to why [T.B.] was at the doctor's office for a checkup by [the mother]. Nurse George then asked [the mother] not to talk when [T.B.] came in to be looked at and that she would ask [T.B.] for an explanation. Nurse George asked [T.B.] why he was at the doctor's office and he responded "Because my nose hurts." When asked by Nurse George why his nose hurt he responded, "My brothers were hitting me." When asked why they were hitting him [T.B.] responded, "[the father] told them to."

Yet interviews with the children, which occurred approximately within a week of the alleged incident and were included in the DHS report, elicited no statements concerning T.B.'s nose. Instead, T.B. and R.B. both stated T.B. was struck *in the lip*. And while T.B. testified the punching caused him to bleed from the lip, R.B. adamantly denied there was bleeding. T.B. also claimed he left the living room after being punched, washed the blood off his lip, and took a nap with everyone else. R.B. claims T.B. never left the room and everyone in the living room watched a movie together. Both T.B. and R.B. also stated repeatedly that their father did not punch T.B. during this incident. B.B. neither confirmed nor denied that he and his brother were forced to strike T.B.

The second report, dated October 18, 2013, and drafted by a second DHS worker, contained radically different accounts of the situation. B.B., previously silent, informed the DHS worker that the father had hit T.B. in the face, made him bleed, and also forced the other two boys to hit T.B. R.B. changed his story and now stated the father punched T.B. in the face, though "when asked how he knew that he said that he heard it . . . he had taken a nap and 'then when I woke

up [the father] said, "Come over here.'" He went on to say, 'That's when the punching began.'" When questioned again whether the father had done anything himself to hurt T.B., R.B. responded "not that I know of." When asked if T.B. had bled, R.B. stated he had, "but when asked how the bleeding had occurred he said he did not know." T.B. also stated the father had punched him in the face along with R.B. and B.B. "over and over." T.B. stated he had bled, and when asked who had made him bleed he responded "Probably dad . . . because he punched me harder, Dad punched me the hardest." T.B. further indicated the father had not struck him before or since.

The DHS worker interviewed the children a second time at their school. This time, R.B. indicated the father had not hit T.B. When the interviewer spoke with T.B., T.B. reiterated R.B. and B.B. had struck him but that the father had hit him as well, which made his lip bleed. When asked whose hands had hit T.B., B.B. responded that he, R.B., and the father had. B.B. also stated T.B.'s lip had bled.

Based on this information, the State filed three CINA petitions, alleging the children were in need of assistance pursuant to Iowa Code section 232.2(6)(c)(2) and (h) (2013). A hearing was held on December 12, 2013. During the hearing, Sandra Nyberg, the father's neighbor and a daycare operator, testified she saw nothing of concern. The father's father and the father's cousin testified as well, stating they believed the father was a good dad and that they had never witnessed him abuse the children. Rather, they testified the children were always happy to see the father.

The father also testified and denied the allegation of abuse. He asserted that, due to their acrimonious divorce, the mother had coerced the children to say the father had forced R.B. and B.B. to punch T.B. The father noted the children were very active—he engaged in wrestling and boxing with them—but at no point did he force the other children to punch T.B. The mother testified she did not coach the children to accuse the father. During the hearing it was established that T.B. did not suffer an injury, other than his runny nose for which he was seen by the nurse.

On January 10, 2013, the juvenile court dismissed the three CINA petitions. In its order, the court noted the forensic interviewer was provided a briefing by the State as to what had allegedly occurred, and therefore it "consider[ed] the interviews of the children to be law enforcement interviews of the children by proxy." The court was further concerned "that this interview provides absolutely no context for when this alleged incident described by [T.B.] took place . . . . [and] thus leaves open all questions relating to motivation, causation or temporal context." The court also noted in his interview B.B. pointed to R.B. as the aggressor, and there was significant inconsistency in the children's statements from the time they were initially interviewed compared to their statements in October 2013. The juvenile court found the statements of the children to be inconsistent, "highly suspect," and not credible. Consequently, the court concluded the mother "has led her children to conclude that their father is a dangerous and violent person . . . . [and] there is no evidence before the Court to conclude that the children did not enjoy a sense of safety and security around

their father in August of 2013." Therefore, the court dismissed the petitions. The State and the children's guardian ad litem appeal.

## II.

We review CINA proceedings de novo. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). We review both the facts and the law, and we adjudicate rights anew. *Id.* (citations omitted). "Although we are not bound by them, we give weight to the trial court's findings of fact, especially when considering credibility of witnesses." *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000). We do this because the juvenile court "heard and observed [the witnesses] firsthand." *In re D.T.*, 435 N.W.2d 323, 329 (Iowa 1989); *see also In re E.H. III*, 578 N.W.2d 243, 248-49 (Iowa 1998) (giving weight to the juvenile court's finding that father's testimony was not credible "in assessing the evidence before us" and "again rely[ing] on the juvenile court's assessment of the credibility of [opposing] witnesses in weighing the evidence on appeal"); *In re C.S.*, No. 05-1738, 2005 WL 3478174, at *2 (Iowa Ct. App. Dec. 21, 2005) ("The juvenile court found [mother]'s testimony in support of [a] claim to be totally lacking in credibility and rejected the claim. Giving due weight to the court's credibility findings . . . we agree and affirm.").

## III.

To adjudicate the children CINA under Iowa Code section 232.2(6)(c)(2), the State must prove by clear and convincing evidence the child has suffered or is imminently likely to suffer harm as a result of the failure of the child's parent "to exercise a reasonable degree of care in supervising the child." Subparagraph (h)

allows children to be adjudicated CINA when they have "committed a delinquent act as a result of pressure, guidance, or approval from a parent."

In the present case, there have been conflicting statements from the children regarding whether the father struck T.B., where T.B. was struck, and whether T.B. bled. While it is expected that young children cannot remember every minute detail of certain events, after observing the witnesses firsthand, the juvenile court determined the allegations of physical abuse were not credible due to these material inconsistencies. The juvenile court also noted the mother had motive to fabricate a story and/or coach the children. The parents had an acrimonious divorce resulting in their present inability to communicate and giving rise to incidents of violence between the children's father and their stepfather. Further, the children's father and their mother and stepfather have traded accusations and counter-accusations of sexual abuse and physical abuse of the children giving rise to an inference the parents were and are attempting to influence the outcome of the parents' dissolution proceeding and their post-dissolution relationships with the children. Given the foregoing, we cannot say the juvenile court erred in concluding the State failed to prove the allegations in the petition by clear and convincing evidence.

The juvenile court also concluded the State failed to prove the court's aid is required to protect the children. *See* Iowa Code § 232.96(9) ("If the court concludes that facts sufficient to sustain the petition have been established by clear and convincing evidence *and that its aid is required*, the court may enter an order adjudicating the child to be a child in need of assistance." (emphasis added)). R.B. and T.B. both stated that no incident similar to the alleged incident

at issue has happened before. There is no indication that any similar incident has happened since the alleged incident at issue. Thus, even if the allegations are true, the incident appears to be isolated. The juvenile court found there was no evidence supporting the conclusion the children did not enjoy a sense of safety and security around their father. We cannot say the juvenile court erred in concluding that its aid was not required under the facts and circumstances of this case.

IV.

Therefore, due to the facts outlined above, we independently conclude B.B., T.B., and R.B. should not be adjudicated CINA. We affirm the juvenile court's dismissal of the petitions.

**AFFIRMED.**

Tabor, J., concurs; Vogel, P.J., dissents.

**VOGEL, P.J.** (dissenting)

I respectfully dissent from the majority and would reverse the decision of the juvenile court.

I agree with the majority that this is a difficult case. There have been conflicting statements from the children, including whether the father struck T.B., whether T.B. bled, the number of times T.B. was struck, as well as the timeframe as to when this incident occurred. Moreover, the ongoing tension between the mother and the father may result in unreliable testimony from both parties.

However, I disagree with the juvenile court's assessment that the forensic interviewer conducted a "biased interview" of the children. The interviews were conducted just days after the reported incident occurred. There was no indication proper protocol was not followed by the interviewer. She asked open-ended and non-leading questions, which tends to ensure trustworthiness in the answers. *See State v. Rojas*, 524 N.W.2d 659, 663 (Iowa 1994) (noting open-ended, non-leading questions are not the kind that would prompt a child to fabricate a response). Additionally, the scope of the interviews was broad, and the interviewer touched on several topics so as to allow the children to express themselves freely. And while she was informed of the events comprising the basis of the investigation, it was important that the interviewer understood the nature of the allegation in order to conduct an effective interview. Consequently, I would conclude the recorded interviews of the children have the indicia of reliability free from any claimed bias of the interviewer, including the children's statements that the father forced R.B. and B.B. to strike T.B.

Furthermore, while the children's statements varied over the course of the investigation, the statements have remained consistent in regard to one key fact: the father forced R.B. and B.B. to punch T.B. in the face. In their forensic interviews, both R.B. and T.B. indicated T.B. was hit in the lip as a result of the father's coercion. This statement has also remained consistent when the two boys were interviewed by several different DHS workers.[1] What is also concerning—though it is another indication of reliability—is that this same allegation was reported in 2012. Furthermore, the father's record indicates he has a propensity for violence, considering he has two assault convictions, one in 2011 and one in 2013.

From a reading of the juvenile court's order, it appears the court's primary reason for denying the CINA petition was the perceived bias of the forensic interviewer. While, like the majority, it also placed weight on the children's inconsistent statements, as stated previously, B.B. and T.B. never varied from their claim the father forced R.B. and B.B. to punch T.B. in the face. Moreover, the inconsistencies with regard to the father striking T.B. only occurred after the children had been away from his care for several months.

Our primary concern is the best interest of the children. *K.N.*, 625 N.W.2d at 733. The guardian ad litem disagreed with the juvenile court's dismissal of the petitions as running contrary to ensuring the children's safety. When the facts suggest abuse, we should err on the side of protecting the children. Therefore,

---

[1] While B.B. did not initially state he was forced to strike T.B., his young age provides a reason for this inconsistency. However, this does not change the fact the older two children—R.B. and T.B.—remained consistent in their statements that the father induced R.B. and B.B. to strike T.B.

on a de novo review of the record, including the taped interviews of the children, I would find the State proved by clear and convincing evidence the children should be adjudicated CINA.