# IN THE COURT OF APPEALS OF IOWA

No. 14-0850
Filed October 1, 2014

**IN THE INTEREST OF E.R. and E.R.,**
**Minor Children,**

**M.K., Mother,**
**Appellant.**

_____

Appeal from the Iowa District Court for Plymouth County, Julie A. Schumacher, District Associate Judge.

A mother appeals the juvenile court order adjudicating her children to be in need of assistance pursuant to Iowa Code section 232.2(6)(c)(2) (2013). **REVERSED.**

John S. Moeller of John S. Moeller, P.C., Sioux City, for appellant mother.

Thomas J. Miller, Attorney General, Bruce Kempkes, Assistant Attorney General, Darin J. Raymond, County Attorney, and Amy K. Oetken, Assistant County Attorney, for appellee State.

Rosalynd J. Koob of Heidman Law Firm, Sioux City, for father.

Kathryn Kirts of Juvenile Law Center, Sioux City, attorney and guardian ad litem for minor child Et.R.

Robert B. Brock, LeMars, attorney and guardian ad litem for minor child Em.R.

Considered by Potterfield, P.J., and Tabor and Mullins, JJ.

**POTTERFIELD, P.J.**

A mother appeals the juvenile court order adjudicating her children to be in need of assistance pursuant to Iowa Code section 232.2(6)(c)(2) (2013). The mother acknowledges Em.R. has significant mental health and emotional issues, but she argues there is no support for a finding that her children's mental health issues are "caused by a lack of supervision" on her part.

**I. Background Facts.**

The parents involved here went through a very contentious divorce in 2007. The dissolution decree placed the children (Em.R., born in 2000, and Et.R., born in 2004) in the parents' joint physical care. The hostility between the parents continued. In August 2011, the decree was modified because the parents had proved they could not co-parent. The children, especially Em.R., were showing mental health effects of the parents' hostility. The court ordered the children placed in the mother's physical care. Matters did not get better.

Over the years, the department of human services (DHS) has been called on many occasions to investigate allegations of child abuse involving these two parents. In 2012, it was reported Em.R. was taken to the emergency room many times for purported seizures, but no medical condition could be found, which led to a child abuse assessment initiated in March 2012 on the basis that her parents were denying Em.R. critical care. Em.R. was hospitalized for further testing regarding the seizures. The investigator noted that during the April 2012 hospitalization, Em.R. "admitted to some faking seizures." The investigator visited Em.R.'s social worker and doctor. The social worker "reported that [the mother] and [the father] continue to bad mouth each other" and suggested the

mother needed psychological help. A week later, the investigator's assessment report notes that she again spoke with the social worker, who stated Em.R. was still in their care. The social worker stated Em.R.

> likes attention and that she believes that she will only get it if there is something wrong with her. Even while in their care she trips and falls and claims that she hurt herself. She bangs her head when she does not get her way. They [staff] are concerned that [the mother] reacts and over reacts to all of [Em.R.'s] symptoms.

The investigator noted she received a letter and progress report from Stacey Norton, which had been written in November 2011 as a result of the mother's request to start with a new therapist. The investigator reported that in the letter Norton "expressed her concern for [Em.R.] and [Et.R.]'s mental welfare. She stated that if the animosity and parental alienation continues, [Em.R.]'s long term welfare is in jeopardy." This March 2012 abuse assessment, however, concluded:

> It appears that [the mother] over reacted to [Em.R.]'s symptoms. It's believed that [the mother] has enabled [Em.R.] by doing so. She has fed into [Em.R.]'s issues. . . . [By] feeding into [Em.R.]'s issues and over reacting by taking her to the ER on numerous [occasions] she did subject her to numerous x-rays which is not healthy for a child or anyone. However she did not suffer injury or death from that. There are also concerns that [Em.R.] was hearing the stressors that her mother was experiencing, felt scared and overwhelmed and was internalizing the conflict and depression which she then acted out on.
> Factor 4: The caretaker failed to provide the type of supervision that a reasonable and prudent person would exercise under similar facts and circumstances.
> [The mother] did not fail to provide the type of supervision that a reasonable and prudent person would exercise. She sought the medical treatment for her daughter that she felt was needed. She was genuinely concerned for her daughter's health, mentally and physically. One might argue that she could have used better judgment in deciding when she took her to the ER or not but at the time she did not know for a certainty that [Em.R.] was faking. Now

that she is educated on [Em.R.]'s diagnosis' she should be able to do that.

. . . .

. . . Both [parents] want what's best for their children. They want [Em.R.] to get the help she needs. They also realize that they need to make sure they give [Et.R.] the attention he needs. They are both concerned about how [Em.R.]'s issues have affected [Et.R.]. They both appear to have age appropriate expectations for the children. What they need to work on is not saying negative things about each other in front of the children and they need to make sure they don't put the children in the middle. They have to find a way to be civil for the children's sake.

The assessment did not confirm the allegation of denial of critical care.

Em.R. received inpatient mental health treatment from May 2012 to October 2012.

In November 2013, a year after Em.R.'s discharge from inpatient treatment, the mother reported Em.R. had disclosed her father had raped her. During the subsequent investigation it was found that Em.R. was in need of ongoing mental health treatment, and Et.R. had recently begun pulling out his hair, behavior diagnosed as stress-induced alopecia. It was also noted the children were absent from school on numerous occasions. The abuse investigator, Social Worker III, Chantel Rol, prepared a preliminary report to the court, which was filed with a child-in-need-of-assistance (CINA) petition. The CINA petition asserted the children should be adjudicated CINA under Iowa Code sections 232.2(6)(b)[1] and (c)(2) (2013).[2]

---

[1] "Whose parent . . . has physically abused or neglected the child, or is imminently likely to abuse or neglect the child." Iowa Code § 232.2(6)(b).

[2] "The failure of the child's parent, guardian, custodian, or other member of the household in which the child resides to exercise a reasonable degree of care in supervising the child." Iowa Code § 232.2(6)(c)(2).

A hearing was held on January 31 and February 5, 2014. The juvenile court noted the family had been involved with DHS abuse assessments six times and the children had numerous absences from school. The court pointed out Em.R.'s "history of psychosomatic symptoms" and the March 2012 abuse assessment. The court also noted that three days before the adjudication hearing, the mother took Et.R. to Em.R.'s child psychiatrist and the child was placed on medication for attention deficit hyperactivity disorder (ADHD). The court indicated the mother's testimony that she had had repeated conversations with Et.R.'s teacher about the child's need for medications was contravened by the teacher's testimony that she saw no signs of ADHD in Et.R. and the child had no symptoms that would indicate the need for medication. The court found the teacher's testimony credible.

The court also addressed Et.R.'s hair loss, and found the mother's claim—that just days before the hearing a doctor opined the hair loss is due to a fungus—was not supported by any medical documentation. The juvenile court set out a history of mental health providers expressing concern about the children being placed in the middle of the parents' dysfunctional relationship, specifically quoting Stacey Norton's and Rebecca Walding's reports, to which the mother had raised hearsay objections. The court concluded the State had not proved the elements of section 232.2(6)(b). But, the court did adjudicate the children CINA pursuant to section 232.2(6)(c).

> The Court further finds that the Court's aid is required. [Em.R.] and [Et.R.] have been subjected to inappropriate parenting and inappropriate supervision, mainly at the actions of their mother. The level of parental conflict has affected both children. [Em.R.] has been affected by such in the past, and continues to exhibit

grave consequences as a result of this conflict. [Et.R.] has also shown signs of this conflict, the most recent sign manifesting in his stress induced alopecia.

Following a May 2014 disposition hearing, the court adopted the recommendations found in the case plan and ordered the children remain in the mother's care subject to the protective supervision of DHS. Noting the children had not attended several of their scheduled therapeutic appointments, and that "[n]either the therapy itself nor the therapists have been consistent," the court ordered the parents and children to "attend counseling as scheduled by their therapists, with the therapists being determined by [DHS] in consultation with the children's guardian ad litems/attorneys [(GALs)]." The court ordered the parents to sign all releases of information requested by DHS; visitation between the children and the father would be at the discretion of DHS and the GALs; and the children were to attend school, medical appointments, and their therapy as determined by DHS and the GALS.

The mother appeals. The father and the GALs join the State's response, which supports the adjudication.

**II. Scope and standard of review.**

We review child-in-need-of-assistance (CINA) proceedings de novo. *See In re J.S.*, 846 N.W.2d 36, 40 (Iowa 2014). We give weight to the findings of the juvenile court, especially concerning the credibility of witnesses, but we are not bound by them. *Id.* We will uphold an adjudicatory order only if there is clear and convincing evidence supporting the statutory grounds cited by the juvenile court. *See* Iowa Code § 232.96(2). Evidence is "clear and convincing" when there are no serious or substantial doubts as to the correctness of the

conclusions of law drawn from the evidence. *In re C.B*, 611 N.W.2d 489, 492 (Iowa 2000).

**III. Hearsay objections.**

The mother first asks that we conclude the juvenile court erred in overruling her hearsay objections to two exhibits. The first is a November 23, 2011 progress report letter from Stacey Norton (who had provided therapy to the children and the parents) sent to the mother, the father, and "other parties involved with this family"—including the mother's attorney, Amanda Van Wyhe, and Rebecca Walding. This letter is referred to in the March 2012 abuse assessment, as well as the assessment that led to these proceedings. The other exhibit is a November 27, 2013 letter to Chantel Rol from Rebecca Walding, a therapist who provided services to Em.R. from January 2011 to February 2012. Testimony established that Rol, the social worker investigating the most recent allegation of abuse, relied upon these documents in conducting her child abuse investigation and her subsequent recommendation that a CINA petition be filed.

Some hearsay statements are permitted in adjudicatory hearings in a CINA case:

> A report, study, record, or other writing . . . made by the department of human services, a juvenile court officer, a peace officer or a hospital relating to a child in a proceeding under this division is admissible notwithstanding any objection to hearsay statements contained in it provided it is relevant and material and provided its probative value substantially outweighs the danger of unfair prejudice to the child's parent, guardian, or custodian. The circumstances of the making of the report, study, record or other writing or an audiotape or videotape recording, including the maker's lack of personal knowledge, may be proved to affect its weight.

Iowa Code § 232.96(6).  In *In re Long*, 313 N.W.2d 473, 478 (Iowa 1981), our supreme court wrote:

> Exhibit 1 is clearly to be classified as a department of social services report.  The person who prepared the exhibit was closely cross-examined regarding the circumstances of the making of the report and the sources for the information contained in it.  *While the maker's dependence on other sources or lack of personal knowledge of matters reported may affect the weight to be given the report, this does not preclude its admission as hearsay, or even on the ground of multiple hearsay.*

(Emphasis added.)  We conclude the juvenile court did not err in allowing the exhibits.

**IV. Merits.**

We have no doubt these children are in need of assistance.  However, our supreme court has recently noted, "The grounds for a CINA adjudication do matter."  *J.S.*, 846 N.W.2d at 41.

Iowa Code section 232.2(6)(c)(2) defines a child in need of assistance as one "[w]ho has suffered or is imminently likely[3] to suffer harmful effects[4] as a result of . . . the failure of the child's parent . . . to exercise a reasonable degree of care in supervising the child."  We interpret the provision liberally and broadly to protect children, *see J.S.*, 846 N.W.2d at 43, but we cannot read it so broadly as to include the parents' conduct here, particularly where the code clearly addresses the conduct in another provision.  See Iowa Code § 232.2(6)(c)(1) (defining a child in need of assistance as one who "has suffered or is imminently

---

[3] We liberally interpret the phrase "imminently likely" in the CINA context.  *J.S.*, 846 N.W.2d at 43 ("Child protection statutes 'are designed to prevent probable harm to the child and do not require delay until after harm has occurred.'" (quoting *In re L.L.*, 459 N.W.2d 489, 494 (Iowa 1990)).

[4] "Although chapter 232 does not contain a definition of 'harmful effects,' we have noted it 'pertains to the physical, mental or social welfare of a child.'"  *J.S.*, 846 N.W.2d at 41 (quoting *In re Wall*, 295 N.W.2d 455, 458 (Iowa 1980)).

likely to suffer harmful effects as a result of . . . [m]ental injury caused by the acts of the child's parent.").[5]

The State points to the children's poor school attendance and lack of consistent attendance of therapy and notes the mother has physical care of the children and is responsible for their attendance. But the State has failed to establish these are a result of the mother's failure "to exercise a reasonable degree of care in supervising the child." As pointed out by the DHS investigator in 2012, "[the mother] did not fail to provide the type of supervision that a reasonable and prudent person would exercise. She sought the medical treatment for her daughter that she felt was needed." In addition to "improper parenting," the juvenile court found the children had been subjected to "improper supervision" but does not explain in what manner. There may be a question about whether the mother's judgment is faulty, but we do not agree the issue here falls under the rubric of a failure to exercise a reasonable degree of care in supervising the child.

Typically, an adjudication as a child in need of assistance pursuant to Iowa Code section 232.2(6)(c)(2) involves a parent who inadequately or insufficiently supervises a child due to inability or lack of concern, placing the child at risk of harm. *See In re D.T.*, 435 N.W.2d 323, 326–28 (Iowa 1989) (upholding finding CINA under section 232.2(6)(c)(2) where children were living in "squalid conditions, eating garbage, playing in raw sewage," and allowed to

---

[5] We note, too, section 232.2(6)(f), which defines a child in need of assistance as one "[w]ho is in need of treatment to cure or alleviate serious mental illness or disorder, or emotional damage as evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others and whose parent, guardian, or custodian is unwilling to provide such treatment."

"play unsupervised in the street"). We note, however, our supreme court has also found the provision satisfied where an "overprotective" parent provided what experts agreed to be improper care. *In re B.B.*, 440 N.W.2d 594, 596 (Iowa 1989).

In *B.B.*, the court concluded the State had proved the parents' failed to exercise a reasonable degree of care in supervising their child based on the mother's insistence that her child of limited intelligence not attend school. 440 N.W.2d at 597-98. The court observed, "[The mother's] blind devotion to the child has clouded her thinking. She is simply irrational . . . ." *Id.* at 597. The court noted the mother's attempts to teach the child at home were ineffective and "the experts all agree that special education classes *in school*" were necessary and the child's lack of attendance at school "has adversely affected his educational, social, and emotional development." *Id.* at 597-98.

Here, adequate protection for these children can be found in a plain reading of section 232.2(6)(c)(1) because both children have sustained mental injury at the hands of both parents. Em.R. has been in and out of mental health therapy since she was three years of age, and Et.R. is suffering from hair loss as a result of stress. The district court adjudicated the children as in need of assistance because of the effects on both children of their parents' "tumultuous relationship" and "the harmful effects the parents' behaviors was having on the children." Although the court found the mother used excessive medical appointments for Em.R. over the years, and would change therapists or fail to have Em.R. attend therapy when the professional opinions implicated the mother in Em.R.'s symptoms, the underlying harms to be addressed by court

intervention involved the mental health symptoms caused by the parents' behaviors. This is not a case like *B.B.* in which the parents' choice of care (educational care for B.B.) resulted in a lack of full opportunity to realize their potential. Rather, the parents' behaviors toward each other and in the presence of the children have created harm.

However, to adjudicate these children as CINA for failure to exercise a reasonable degree of care in supervising the children is to read section 232.2(6)(c)(2) so broadly as to render its terms meaningless.

We therefore reverse and remand the adjudication pursuant to Iowa Code section 232.2(6)(c)(2).

**REVERSED.**